### N.C. STEEL v. NATIONAL COUNCIL ON COMPENSATION INS.

[123 N.C. App. 163 (1996)]

N.C. STEEL, INC.; N.C. STEEL ERECTORS, INC.; N.C. STEEL MANAGEMENT, INC.; N.C. STEEL FABRICATORS, INC., AIRCRAFT SERVICES OF RALEIGH, INC.; MONTAGUE BUILDING COMPANY; SMITH & SMITH, SURVEYORS, P.A., AND NORTH CAROLINA MARBLE & GRANITE, PLAINTIFFS, v. NATIONAL COUNCIL ON COMPENSATION INSURANCE; NATIONAL WORKER'S COMPENSATION REINSURANCE POOL; NORTH CAROLINA RATE BUREAU; AETNA CASUALTY & SURETY COMPANY; CIGNA INSURANCE COMPANY AND INS. CO. OF NORTH AMERICA; EMPLOYERS INS. OF WAUSAU A MUTUAL COMPANY; FIDELITY & CASUALTY CO. OF N.Y.; HARTFORD UNDERWRITERS INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; MICHIGAN MUTUAL INSURANCE COMPANY; NATIONAL SURETY CORPORATION; ST. PAUL FIRE & MARINE INSURANCE COMPANY; THE TRAVELERS INSURANCE COMPANY; AND UNITED STATES FIDELITY AND GUARANTY COMPANY, DEFENDANTS

No. COA95-380

(Filed 16 July 1996)

**1. Pleadings § 117 (NCI4th)— 12(b)(6) motion—affidavits considered—summary judgment despite parties' stipulation**

Although the parties purported to stipulate at the hearing below that the trial court could decide the case pursuant to N.C.G.S. § 1A-1, Rule 12, the trial court explicitly acknowledged that it considered affidavits submitted by plaintiffs and the court's memorandum and order aptly demonstrated that it relied heavily on plaintiffs' affidavits. As a result, the case is on appeal pursuant to a grant of summary judgment.

**Am Jur 2d, Pleading § 230; Summary Judgment § 13.**

**What, other than affidavits, constitutes "matters outside the pleadings," which may convert motion under Federal Rule of Civil Procedure 12(b), (c), into motion for summary judgment. 2 ALR Fed. 1027.**

**2. Unfair Competition or Trade Practices § 33 (NCI4th)— filed rate doctrine—adopted in unfair competition actions**

The filed rate doctrine is recognized and adopted in the context of a suit under N.C.G.S. § 75-1 in an action in which corporations which are or were required to provide workers' compensation insurance alleged that defendants (workers' comp insurers and incorporated insurance rating organizations) undertook actions which violated N.C.G.S. § 75-1 and resulted in higher workers' compensation premiums and other damages. The filed

rate doctrine holds that a plaintiff may not claim damages on the grounds that a rate filed with and approved by a regulator as reasonable was nonetheless excessive or inadequate because it was the product of an anticompetitive conspiracy or other unlawful conduct by defendants. N.C.G.S. § 58-2-75.

**Am Jur 2d, Consumer and Borrower Protection § 302; Monopolies § 299.**

3. **Insurance § 8 (NCI4th)— workers' compensation rates— filed rate doctrine—claim for illegally fixed rates**

The trial court did not err in dismissing a claim for relief that workers' compensation insurers and their rate bureau had illegally fixed rates because that claim would require a jury to recalculate rates, which would violate the filed rate doctrine.

**Am Jur 2d, Consumer and Borrower Protection § 302; Monopolies § 299.**

4. **Insurance § 8 (NCI4th)— workers' compensation—illegal agreement increasing residual market—filed rate doctrine—claim not excluded**

The filed rate doctrine does not preclude recovery on a claim that an illegal agreement between the defendants set an artificially high serving fee to workers' compensation carriers which forced employers into the residual market where they must pay surcharges and lose opportunities for ·discounts and dividends. The filed rate doctrine does not act to bar any claims which involve damages other than inflated rates; this claim does not require approved rates to be calculated. There is no authority for dismissing a state antitrust claim based on the filed rate doctrine when damages are not calculated by measuring the difference between the filed rates and rates which would have been approved but for illegal conduct.

**Am Jur 2d, Consumer and Borrower Protection § 302; Monopolies § 299.**

Appeal by plaintiffs-appellants from Memorandum and Order entered 14 February 1995 by Judge Giles R. Clark in Wake County Superior Court. Heard in the Court of Appeals 24 January 1996.

**N.C. STEEL v. NATIONAL COUNCIL ON COMPENSATION INS.**

[123 N.C. App. 163 (1996)]

*Lore & McClearen, by R. James Lore & R. Edwin McClearen, & Siegel, Brill, Greupner & Duffy, P.A., by Wood R. Foster, Jr., Wm. Christopher Penwell, and Jordan M. Lewis, for plaintiffs-appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by James D. Blount, Jr., for defendant-appellee Aetna Casualty & Surety Company.*

*Womble Carlyle Sandridge & Rice, P.L.L.C., by Pressly M. Millen, for defendants-appellees National Council on Compensation Insurance and National Workers' Compensation Reinsurance Pool.*

*Young, Moore and Henderson by R. Michael Strickland for defendant-appellee North Carolina Rate Bureau.*

*Poyner & Spruill, by John R. Jolly, Jr., for defendants-appellees Cigna Insurance Company, and Insurance Company of North America.*

*Ragsdale, Liggett & Foley, by George R. Ragsdale, for defendant-appellee Employers Insurance of Wausau.*

*Cranfill, Sumner & Hartzog, by Dan M. Hartzog, for defendant-appellee Fidelity & Casualty Company, of New York.*

*Moore & Van Allen, by Joseph W. Eason, for defendant-appellee Hartford Underwriters Insurance Company.*

*Manning, Fulton & Skinner, by John B. McMillan, for defendant-appellee Liberty Mutual Insurance Company.*

*Moore & Van Allen, by Joseph W. Eason, for defendant-appellant Michigan Mutual Insurance Company.*

*Maupin, Taylor, Ellis & Adams, by M. Keith Kapp, for defendant-appellee National Surety Corporation.*

*Petree Stockton, L.L.P., by John L. Sarratt, for defendant-appellee St. Paul Fire & Marine Insurance Company.*

*Parker, Poe, Adams & Bernstein, by John F. Graybeal, for defendant-appellee Travelers Insurance Company.*

*Tharington, Smith & Hargrove, by Douglas E. Kingsbery, for defendant-appellee United States Fidelity & Guaranty Company.*

WYNN, Judge.

The record, taken in the light most favorable to plaintiffs, tends to show the following: Plaintiffs in this action are North Carolina corporations which are either currently required to provide workers' compensation insurance pursuant to Chapter 97 of the North Carolina General Statutes, or were formerly required to do so. Defendants are workers' compensation insurers, except for National Council on Compensation Insurance (hereinafter NCCI) and North Carolina Rate Bureau (hereinafter NCRB) which are incorporated insurance rating organizations. Plaintiffs allege that defendants, along with others not named in this lawsuit, undertook actions which violated N.C. Gen. Stat. § 75-1 *et seq.* (1994), and that these illegal actions resulted in higher workers' compensation premiums, and other damages to the plaintiffs. Defendants contend that plaintiffs cannot maintain this action in light of a doctrine known as the "filed rate doctrine".

N.C. Gen. Stat. §§ 97-9, 97-93 (1991 & Supp. 1995) require that all employers, with certain exceptions not relevant to this opinion, secure workers' compensation insurance for their employees. Employers may satisfy this statutory requirement through self-insurance if the employer meets the statutory requirements to self-insure. Employers which are required to insure workers under Chapter 97 and are not qualified to self-insure, or choose not to self-insure, must purchase insurance from a private company.

There are two "markets" in which a purchaser of workers' compensation insurance may purchase that insurance: The voluntary market, and the residual market. Employers which desire workers' compensation insurance first attempt to secure coverage in the voluntary market from a private insurance company. Employers which cannot find an insurance company to accept them in the voluntary market must purchase insurance in the residual market, which is often referred to as the assigned risk pool.

It is more advantageous for an employer to purchase insurance in the voluntary market than the residual market for three principal reasons: (1) There is a surcharge in the residual market. Residual market premiums are calculated in a similar manner as in the voluntary market, and the resulting premium amount is multiplied by a surcharge to reflect the increased risks presented by employers in the residual market; (2) dividends are often paid on policies in the voluntary market, but not on policies in the residual market; and (3) discounts

sometimes available in the voluntary market are not available in the residual market.

In North Carolina, workers' compensation insurance rates are regulated by the Department of Insurance, created by N.C. Gen. Stat. § 58-2-1 (1994). That department executes the laws relating to insurance as prescribed by the General Assembly. The Commissioner of Insurance of North Carolina (hereinafter Commissioner) is an elected official who serves as the chief officer of the Department of Insurance.

When insurers request rate increases, the NCRB and the NCCI begin the process by filing a formal rate increase request with the Commissioner. In filing such a request, the NCRB attempts to estimate the amount of premium income needed to cover total projected expenses in the coming year. Included in this total are administrative expenses, and claims. From the total expenses projected, NCRB subtracts investment income, and builds in a reasonable profit.

Upon filing a request to increase rates, NCRB must submit detailed statistical information, including but not limited to investment earnings, overhead expenses, trends in insurance costs and other information requested by the Commissioner. From the information available, the Commissioner determines the workers' compensation rates for each of nearly six hundred different job classifications. By statute, rates must not be excessive, inadequate or unfairly discriminatory. N.C.G.S. § 58-36-10.

This regulatory scheme is intended to displace price competition; insurers are forbidden from issuing a policy at a rate other than that approved by the Commissioner for the relevant job classification unless a deviation has been approved by the Commissioner.

Under the North Carolina Workers Compensation Insurance Plan (hereinafter the Plan), the Commissioner delegates management of the residual workers' compensation market to NCRB. Each insurer must file written authority with NCRB permitting NCRB to assign risks to the insurer which cannot be placed in the voluntary market. NCRB has apparently delegated management of the Plan to defendant National Worker's Compensation Reinsurance Pool (hereinafter National Pool).

The National Pool, consisting of all insurance companies which write workers' compensation insurance in North Carolina, was created by defendant NCCI, and is managed by NCCI. NCCI assigns

each employer a servicing carrier from among the eleven companies chosen by the National Pool to service the North Carolina residual market. Servicing carriers are responsible for issuing policies, collecting premiums, conducting payroll audits, providing inspections, supervising safety programs and processing claims. Servicing carriers are not responsible, however, for paying claims; rather, the National Pool ultimately pays the claims. Employers in the residual market in effect purchase reinsurance from the National Pool in order to pay on claims in the residual market.

According to plaintiffs' complaint, the servicing carriers are paid a fee which is determined by agreement between the National Pool and the eleven servicing carriers selected by the National Pool through NCCI to service the residual market in North Carolina. Each of the servicing carriers is paid its portion of the servicing carrier fee based upon the percentage of the total premium in the residual market which it collected. The eleven defendant insurance companies in the instant case have been servicing carriers during all or some of the time since 1989.

Plaintiffs' complaint alleges that the agreement between the National Pool and the eleven defendant servicing carriers, which provides that each servicing carrier is paid the same amount as a servicing carrier fee, violates N.C.G.S. § 58-63-15, and thus violates N.C.G.S. § 75-1 et seq. Plaintiffs cite to case law which states that any violation of N.C.G.S. § 58-63-15 constitutes a per se violation of N.C.G.S. § 75-1.1 et seq. See, e.g., Pearce v. American Defender Life Ins. Co., 316 N.C. 461, 343 S.E.2d 174 (1986).

Plaintiffs contend that defendants' failure to disclose information regarding their agreement to fix the servicing carrier fee misled the Commissioner because little attention was focused by the Commissioner on the amount listed as expenses in the filings submitted by defendants. Plaintiffs contend that since expenses were artificially high due to the agreement, the Commissioner approved higher rates in both the voluntary and residual markets than he would have approved "in a competitive residual market."

Plaintiffs set forth two separate claims for relief. In the first claim, plaintiffs allege that they have been damaged by defendants' alleged fixing of the servicing carrier fee because defendants submitted expenses which were inflated due to the conspiracy. Since expenses were inflated, the amount of premium income necessary to pay those expenses, as well as projected claims, was higher than it

would have been had the residual market been a competitive one. Thus, premium rates were higher than they would have been absent the conspiracy.

In their second claim for relief, plaintiffs contend that defendants' fixing of the servicing carrier fee increased the size of the residual market beyond what it would have been. Put another way, the scheme resulted in employers being placed in the residual market which would otherwise have been able to secure insurance in the voluntary market. These employers are damaged due to the loss of possible discounts and dividends, as well as the imposition of a surcharge. Plaintiffs also included in their complaint a request for injunctive relief.

Defendants moved to dismiss plaintiffs' action, alleging that the "filed rate doctrine" barred plaintiffs' claims. In a memorandum and order filed 16 February 1995, Superior Court Judge Giles R. Clark granted defendants' motion to dismiss. From this decision, plaintiffs appeal, and assign error to the dismissal of their two damage claims. Plaintiffs have not assigned error to the dismissal of their request for injunctive relief, thus the trial court's dismissal of plaintiffs' request for an injunction is not before this Court.

[1] As an initial matter, we must determine under which of the North Carolina Rules of Civil Procedure this case is before us. At the hearing below, the parties purported to stipulate that the trial court could decide the case pursuant to N.C. Gen. Stat. § 1A-1, Rule 12 (1990).

However, in dismissing plaintiffs' action under Rule 12, the trial court explicitly acknowledged that it considered affidavits submitted by plaintiffs. In addition, the trial court's memorandum and order aptly demonstrated that it relied heavily on plaintiffs' affidavits.

When a trial court considers matters outside the pleadings, a motion under Rule 12 is automatically converted into a motion for summary judgment. *Stanback v. Stanback*, 297 N.C. 181, 205, 254 S.E.2d 611, 627 (1979); *Kessing v. Mortgage Corp.*, 278 N.C. 523, 533, 180 S.E.2d 823, 829 (1971).

As a result, the case *sub judice* is before this Court pursuant to a grant of summary judgment to defendants on all counts of plaintiffs' claim.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). The trial court must view the forecast of evidence in the light most favorable to the non-moving party. *Craven County Bd. of Education v. Boyles*, 343 N.C. 87, 90, 468 S.E.2d 50, 52 (1996). If summary judgment is granted at trial, the decision should be affirmed if there is any ground to support the decision. *Shore v. Brown*, 324 N.C. 427, 428, 378 S.E.2d 778, 779 (1989).

The issues on appeal are: (I) Whether North Carolina should recognize and adopt the "filed rate doctrine"; (II) if so, whether that doctrine bars plaintiffs' first claim that defendants illegally fixed the service carrier fees; and (III) if so, whether that doctrine bars plaintiffs' second claim that defendants' fixing of the service carrier fee has increased the size of the market beyond what it should have been. We adopt the "filed rate doctrine" for application in North Carolina and conclude that the doctrine bars plaintiffs' first claim, but not their second claim.

I.

[2] Defendants contend on appeal that this Court should recognize and adopt the judicially established "filed rate doctrine" in the context of a lawsuit under N.C.G.S. § 75-1 *et seq*. We agree.

The filed rate doctrine, otherwise known as the Keogh doctrine, was first applied to an antitrust claim by the United States Supreme Court in *Keogh v. Chicago & N.W. R. Co.*, 260 U.S. 156, 67 L. Ed. 183 (1922). The doctrine holds that a plaintiff may not claim damages "based on the grounds that a rate filed with and approved by a regulator as reasonable was nonetheless excessive or inadequate because it was the product of an anticompetitive conspiracy or other unlawful conduct by defendants." *Uniforce Temp. Personnel v. National Council*, 892 F. Supp 1503, 1512 (S.D. Fla. 1995).

In *Keogh*, a manufacturer complained that defendant-shippers illegally agreed to fix rates filed with the Interstate Commerce Commission in violation of the Sherman Antitrust Act, 15 U.S.C.A. § 1. *Keogh*, 260 U.S. at 159-60, 67 L. Ed. at 185-86. The Supreme Court concluded that upon approval of shipping rates by the Interstate Commerce Commission, the rates were established to be lawful and the shipper had no cause of action under the Sherman Antitrust Act. *Id.* at 162-63, 67 L. Ed. at 186-87; *See also Square D Co. v. Niagra Frontier Tariff Bur.*, 476 U.S. 409, 90 L. Ed. 2d 413 (1986). In short,

the Supreme Court held that the filed rate doctrine precludes a plaintiff from stating a cause of action when there is a violation of federal antitrust laws in connection with any rate approved by federal regulators. *Id.* at 422, 90 L. Ed. 2d at 425. Instead, the rate is deemed to be lawful, and cannot be challenged.

Our Supreme Court has held that federal precedent is instructive in interpreting Chapter 75 due to the similarity between provisions of Chapter 75 and the federal antitrust laws. *See, e.g., Madison Cablevision v. City of Morganton*, 325 N.C. 634, 656-58, 386 S.E.2d 200, 213-14 (1989); *Johnson v. Insurance Co.*, 300 N.C. 247, 262, 266 S.E.2d 610, 620 (1980), *rev'd on other grounds, Myers & Chapman Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385 (1988), *reh'g denied*, 324 N.C. 117, 377 S.E.2d 235 (1989); *Rose v. Materials Co.*, 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973). In addition, the filed rate doctrine has been applied to causes of action arising from rates approved by state regulators. *See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485, 488, *cert. denied*, 504 U.S. 957, 119 L. Ed. 2d 228 (8th Cir. 1992); *In re Empire Blue Cross & Blue Shield Cust. Lit. v. Weissman*, 622 N.Y.S.2d 843 (N.Y. Sup. Ct. 1994) *aff'd sub nom. Minihane v. Weissman*, 640 N.Y.S.2d 102 (N.Y. App. Div. 1996); *Prentice v. Title Ins. Co. of Minnesota*, 500 N.W.2d 658, *reh'g denied*, 508 N.W.2d 425 (Wis. 1993), *cert. denied*, —— U.S. —— 127 L. Ed. 2d 378 (1994). As a result, we consider precedent from both federal and state courts insofar as it may assist us in construing Chapter 58 and Chapter 75.

The courts which have adopted the filed rate doctrine have given several reasons for doing so. These reasons include: (1) That the agency's authority to determine the reasonableness of rates must be preserved. *H.J.*, 954 F.2d at 488; *see also Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d. Cir. 1994) (holding that the filed rate doctrine is necessary because:

> Congress and state legislatures establish regulatory agencies in part to ensure that rates charged by generally . . . oligopolistic industries are reasonable . . . . If courts were licensed to enter this process under the guise of ferreting out . . . [antitrust violations] in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system).

*Id.* at 20-21; (2) that the agency which regulates the industry involved possesses expertise with regard to that industry, whereas courts do

not. *Id.* at 21; (3) that allowing a recovery under the antitrust laws would undermine the regulatory scheme, since the statute allows for enforcement by the appropriate state officers. *Id.*; (4) that allowing a suit to proceed under the antitrust laws may result in different prices being paid by victorious plaintiffs than non-suing ratepayers, which violates the statutory scheme of uniform rates. *Id.* at 21-22; *Keogh*, 260 U.S. at 163-64, 67 L. Ed. at 188.

Another factor counseling us to adopt the filed rate doctrine is a desire to insure uniformity with federal antitrust law in order to avoid forum shopping. Since many actions violate both federal and state antitrust laws, *see Cellular Plus Inc. v. Superior Court*, 18 Cal. Rptr.2d 308 (Ca. Ct. App. 1993), and our Chapter 75 has been held by our Supreme Court to be similar to federal antitrust laws, absent compelling reasons to the contrary, we are not inclined to permit a remedy under state law that is not allowed under federal law.

In addition, Chapter 58 of the General Statutes, which regulates insurance in North Carolina, is a comprehensive regulatory scheme which includes remedies for the violations alleged by plaintiffs. N.C.G.S. § 58-2-70(b) states that whenever the Commissioner has reason to believe that any person (defined in N.C.G.S. § 58-1-5 as "an individual, aggregation of individuals, corporation, company, association and partnership") has violated Article 63 of Chapter 58, (which is the article that plaintiffs in the instant case allege that defendants have violated), the Commissioner may hold a hearing to determine if that person has in fact violated Article 63. N.C.G.S. § 58-2-70(b). If the Commissioner finds that a violation of Article 63 has occurred, he or she may order payment of a penalty of up to one thousand dollars ($1,000) for each day a violation has occurred. N.C.G.S. § 58-2-70(d).

Moreover, the Commissioner may apply to the Superior Court of Wake County for an order directing payment of restitution in an amount that would make whole any person harmed by the violation. N.C.G.S. § 58-2-70(c), (e). The Commissioner is also given the power to negotiate an acceptable agreement with any violator. N.C.G.S. § 58-2-70(g).

The above cited sections illustrate that by enacting N.C.G.S. § 58-2-70, the legislature granted the Commissioner the power to ensure that the various provisions of Chapter 58 were followed, and the ability to institute proceedings to recover any money lost by the victims of statutory violations. Agency enforcement of the provisions

of Chapter 58 is a choice made by the legislature. Such a scheme is logical because:

> Individual ratepayers are unlikely to have any special knowledge of the alleged wrongdoing that would make it advantageous to have private enforcement through the . . . antitrust [laws]. By contrast, regulators who are intimately familiar with the industry are best situated to discover when regulated entities engage in [violations of the state antitrust laws].

*Wegoland*, 27 F.3d at 21.

Finally, N.C.G.S. § 58-2-75(a) provides for judicial review of any decision or order of the Commissioner, with exceptions not relevant here. An aggrieved person must file for review within thirty days, or else "the parties aggrieved shall be deemed to have waived the right to have the merits of the order or decision reviewed and there shall be no trial of the merits thereof by any court . . . to enforce or restrain the enforcement of the same." *Id.* In this case, the "merits" are the rates set by the Commissioner.

N.C.G.S. § 58-2-75, in effect, is a thirty day statute of limitations on challenging an order or decision of the Commissioner. After thirty days have passed, the decision is final. Failing to apply the filed rate doctrine would essentially circumvent this time limit in that plaintiffs would be granted the opportunity for a jury to review the rates set by the Commissioner and to substitute its judgment regarding the rates the Commissioner would have approved absent the illegal conduct. We note further that application of the filed rate doctrine serves to follow the command set by the legislature that following the thirty days "there shall be no trial of the merits thereof."

Plaintiffs argue that N.C.G.S. § 58-63-35 represents a "non-exclusivity" clause, which precludes application of the filed rate doctrine. Plaintiffs cite *Stanley v. Moore*, 339 N.C. 717, 454 S.E.2d 225 (1995) for the proposition that such a non-exclusivity clause bars application of the filed rate doctrine.

In *Stanley*, our Supreme Court held that the non-exclusivity clause found in the Ejectment of Residential Tenants Act allowed the plaintiffs to sue their landlord under Chapter 75 if the landlord violated N.C.G.S. § 75-1 *et seq.*, despite the fact that the Ejectment of Residential Tenants Act provided its own remedies, which did not include treble damages. *Id.* at 722, 454 S.E.2d at 228. Plaintiffs con-

tend that the non-exclusivity clause found in N.C.G.S. § 58-63-35 operates in a similar fashion. We disagree.

The non-exclusivity clause referenced in *Stanley* states that "[t]he remedies created by this section are supplementary to all existing common-law and statutory rights and remedies." *Id.* at 722, 454 S.E.2d at 227-28. In contrast, the non-exclusivity clause in N.C.G.S. § 58-63-35(d) provides: "No order of the Commissioner under this Article or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this State."

While the non-exclusivity clause in the Ejectment of Residential Tenants Act unambiguously states that the remedies provided therein are in addition to remedies provided by common law and statute, the non-exclusivity clause in N.C.G.S. § 58-63-35 states only that orders of the Commissioner, or court orders enforcing a Commissioner's order, do not absolve a person affected by either order from compliance with other state laws. Thus, the non-exclusivity clause in the instant case is readily distinguishable from the non-exclusivity clause in *Stanley*.

In addition, N.C.G.S. § 58-2-75 deals specifically with the right to judicial review of a decision of the Commissioner. By contrast, N.C.G.S. § 58-63-35 deals generally with the fact that a Commissioner's order does not negate the necessity to comply with other state laws. "[W]here one statute deals with a particular subject or situation in specific detail, while another statute deals with the subject in broad, general terms, the particular, specific statute will be construed as controlling, absent a clear legislative intent to the contrary." *Nucor Corp. v. General Bearing Corp.*, 333 N.C. 148, 154-55, 423 S.E.2d 747, 751 (1992), *reh'g denied*, 333 N.C. 349, 426 S.E.2d 708 (1993).

Plaintiffs further contend that this Court rejected the filed rate doctrine in *Phillips v. Integon Corp.*, 70 N.C. App. 440, 319 S.E.2d 673 (1984). In *Phillips*, the plaintiff, an agent selling insurance for the defendant, sued under Chapter 75 alleging that the defendant violated their agreement by competing with him to the detriment of his business. The defendant contended that Chapter 58 exclusively regulated insurance companies, and that a suit under Chapter 75 could not proceed for a violation of Chapter 58. *Id.* at 441-43, 319 S.E.2d at 674-75. This Court disagreed and held that Chapter 58 remedies apply when

an insurance company violates Chapter 58. *Id.* at 443, 319 S.E.2d at 675.

The Chapter 58 violations in *Phillips* occurred in the context of a suit for violation of an agency agreement. The *Phillips* Court did not consider rates filed pursuant to Chapter 58. In contrast, the Chapter 75 violations in the instant case occurred in the context of a rate filing. As the *Phillips* Court pointed out, there was little conflict between Chapter 75, and N.C.G.S. § 58-36-30 (formerly N.C.G.S. § 58-124.23). However, we perceive a direct conflict between Chapter 75 and the role of the Commissioner in Chapter 58, in which the Commissioner is empowered, within statutory guidelines, to approve or disapprove insurance rates. If a jury is allowed to recalculate insurance rates based on Chapter 75 violations, the Commissioner's role, as set forth by the legislature, would be subverted.

Plaintiffs further contend that applying the filed rate doctrine in the instant case will effectively grant defendants immunity from our antitrust laws. We disagree. As the United States Supreme Court stated in *Square D*, 476 U.S. 409, 90 L. Ed. 2d 413:

> [W]e disagree, however, with [plaintiffs'] view that the issue in *Keogh* and in this case is properly characterized as an "immunity" question. The alleged collective activities of the defendants in both cases were subject to scrutiny under the antitrust laws by the Government and to possible criminal sanctions or equitable relief. *Keogh* simply held that an award of treble damages is not an available remedy for [a person] claiming that a rate submitted to, and approved by, [the ratemaking authorities] was the product of a antitrust violation.

*Id.* at 422, 90 L. Ed. 2d at 425. *See also Wegoland*, 27 F.3d at 22 (holding that "the filed rate doctrine does not leave regulated industries immune from suit under the . . . antitrust statutes. While individual ratepayers are precluded from challenging the reasonableness of the rates, the proper government officials remain free to pursue this avenue in appropriate circumstances.").

In sum, we conclude that the filed rate doctrine applies in North Carolina in the context of a suit under N.C.G.S. § 75-1 *et seq.*

## II.

[3] Having determined that the filed rate doctrine applies in North Carolina, we must next determine whether it bars plaintiffs from

asserting their claim for relief that "[insurance] rates are forced upwards by the introduction of undisclosed non-competitive expense and loss factors that would be demonstrably lower in a competitive residual market."

Plaintiffs concede that the measure of damages under this theory would be measured by *the difference between the rates as approved by the Commissioner, and the rates which would have been approved but for the illegal conduct of defendants.* In short, as defendants contend, plaintiffs would request that the jury recalculate the rates that the Commissioner would have approved but for the illegal acts of the defendants. It is precisely this calculation which the filed rate doctrine forbids. *See, e.g., H.J.,* 954 F.2d at 488 (stating that the filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue."); *Cullum v. Seagull Mid-South, Inc.,* 907 S.W.2d 741, 744 (Ark. 1995) (same); *Uniforce,* 892 F.Supp at 1512 (stating that "[the filed rate doctrine] precludes a plaintiff from asserting an antitrust claim for damages based on the grounds that a rate filed with and approved by a regulator as reasonable was nonetheless excessive . . . because it was the product of an anticompetitive conspiracy or other unlawful conduct by defendants.").

Since we have determined that the filed rate doctrine should be applied to this case, and that plaintiffs' first claim for relief would require a jury to recalculate rates, which the filed rate doctrine forbids, we hold that the trial court did not err in dismissing plaintiffs' first claim for relief.

III.

[4] Plaintiffs next contend that the filed rate doctrine does not bar their second claim for relief. Their second theory of damages, with all facts assumed to be true, is as follows: An illegal agreement between and among defendants set an artificially high servicing fee to the carriers which service the residual market. This fee is called the servicing carrier fee. The residual market carriers are reinsured by the National Pool, and do not pay out claims in the residual market. Instead, these claims are paid by the National Pool. The money paid by purchasers of insurance in the residual market (residual·market premium) must cover both the excessive servicing carrier fee, and claims in the residual market. Due to the excessive servicing carrier fee, the residual market premium.is insufficient to cover claims in the

residual market (residual market losses). This shortfall is called the residual market burden. All individual companies which are members of the National Pool agree to pay a percentage of the residual market burden based on their share of the North Carolina voluntary insurance market.

Because companies which are members of the National Pool are also sellers of insurance in the voluntary market, their contributions to the residual market burden result in their having less money available to pay losses (claims) in the voluntary market. Since there is less money available to pay claims in the voluntary market, insurers become more selective in underwriting policies in the voluntary market. Thus, more employers are forced to purchase insurance in the residual market. These employers suffer damages by being forced into the residual market, in that they must pay surcharges and they lose opportunities for discounts and dividends.

Defendants contend that the filed rate doctrine precludes recovery on plaintiffs' second claim for relief. We disagree.

As stated earlier, the filed rate doctrine forbids a recovery where the measure of damages is the difference between the rate approved by the regulatory body and the rate which would have been approved absent the illegal conduct. *Cullum*, 907 S.W.2d at 744. However, the filed rate doctrine does not act to bar any claims which involve damages other than inflated rates. *See, e.g., H.J.*, 954 F.2d at 488.

Defendants cite *Uniforce*, 892 F.Supp. 1503 and *Calico Trailer Mfg. Co., Inc. v. Insurance Co. of North America*, 1994 WL 823554 (E.D. Ark. 1994) in support of their contention that plaintiffs' second claim for relief is also barred by the filed rate doctrine. These cases are easily distinguishable. In *Uniforce,* the Court stated:

> In order for this Court or a jury to award damages, it would be necessary to measure the difference between the properly approved workers' compensation insurance rates paid by plaintiffs and those mythical rates which would have been applicable but for the defendants' concerted activity. This undertaking is not within the province of the courts . . . .

892 F. Supp. at 1512. Although, as defendants point out, the *Uniforce* Court dismissed claims similar to those raised by plaintiffs' second claim for relief, it did so on federal antitrust grounds not applicable to the instant case. In addition, the *Uniforce* Court apparently thought that it was necessary to calculate rates which would have

been approved in order to award damages. We do not believe that plaintiffs' second claim for relief requires approved rates to be calculated. Instead, we find that plaintiffs' second claim for relief depends only on the number of employers who were forced to purchase insurance in the residual market by the alleged illegal conduct which would otherwise have been able to purchase insurance in the voluntary market.

In *Calico*, the Court held that the essence of plaintiff's complaint involved a challenge to approved rates. The Court dismissed plaintiff's federal antitrust claims on several grounds, including the filed rate doctrine, and declined to exercise jurisdiction over plaintiff's state-law claims. *Calico*, 1994 WL 823554.

Thus, defendants have cited no authority and we have found none for dismissing a state antitrust claim based on the filed rate doctrine when damages are not calculated by measuring the difference between the filed rates and rates which would have been approved but for illegal conduct. We decline defendants' invitation to expand the filed rate doctrine to cover such claims.

We believe that our holding strikes the appropriate balance between upholding the regulatory scheme and the power of the Commissioner on the one hand, and protecting the citizens and businesses of North Carolina from illegal conduct on the other.

The decision of the court below is affirmed in part and reversed in part, and this case is remanded to the trial court for proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part.

Judges GREENE and McGEE concur.