LUPTON v. BLUE CROSS AND BLUE SHIELD, 1999 NCBC 4

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | GENERAL COURT OF JUSTICE |
| ORANGE COUNTY | ) | SUPERIOR COURT DIVISION |
| | | 98-CVS-633 |
| BRADSHAW B. LUPTON, | ) | |
| individually and on behalf of all persons | ) | **AMENDED ORDER AND OPINION** |
| similarly situated, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BLUE CROSS AND BLUE SHIELD | ) | |
| OF NORTH CAROLINA, a non-profit | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL F. EASLEY, ATTORNEY | ) | |
| GENERAL, on behalf of the rights and | ) | |
| interests of the public, | ) | |
| | ) | |
| Defendant- | ) | |
| Intervenor | ) | |
| | ) | |

{1} This matter is before the Court on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.[fn1] For reasons set forth below, it appears to the Court that the complaint fails to state a claim upon which relief can be granted, and the defendant's motion should be GRANTED.

*Marvin Schiller, Carol M. Schiller; Hare & Hare, by Nicholas S. Hare, for plaintiffs.*

*Maupin Taylor & Ellis, P.A., by M. Keith Kapp, Laura Kay W. Berry, and Kevin W. Benedict; Robinson, Bradshaw & Hinson, P.A., by Robin L. Hinson, A. Ward McKeithen, and Frank E. Emory, for defendant.*

*Attorney General Michael F. Easley, by Special Deputy Attorney General John R. Corne, for defendant-intervenor.*

### FACTS

{2} Plaintiff Lupton filed his action on behalf of himself and all other persons who were, are, or will be subscribers in an underwritten medical service plan of Defendant Blue Cross and Blue Shield of North Carolina (hereinafter "Blue Cross"), seeking a declaratory judgment, preliminary and permanent injunctive relief, and monetary damages.[fn2] The essence of plaintiff's claims is that defendant misrepresented to the Commissioner of Insurance that its reserves were within statutory limits in order to secure approval of higher medical insurance premium rates. (*Giduz* compl. paras. 39, 45-46, 49-50, 53-54, 61; *Lupton* compl. paras. 39, 45-46, 49-50, 53-54, 61.) Plaintiffs' chief allegation in this regard is that Blue Cross included gross receipts from its cost-plus business in its reserves calculation, which is prohibited by N.C.G.S. 58-

65-95. Plaintiffs allege that this purported conduct by the defendant was unfair and deceptive in violation of North Carolina's unfair trade practice laws. Plaintiff further alleges common law causes of action for (1) breach of fiduciary duty, (2) breach of contract, (3) unjust enrichment, and (4) fraud. However phrased, all of plaintiffs' claims seek recovery of the same damages: a substantial refund based on the allegedly excessive reserves accumulated by the defendant.

## OPINION

{3} The standard for ruling on a motion to dismiss pursuant to Rule 12(b)(6) is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory . . . ." *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 556, 558 (1988). However, a motion to dismiss is properly granted where a valid legal defense stands as an insurmountable bar to plaintiffs' recovery. *Horton v. Carolina Medicorp, Inc.*, 344 N.C. 133, 135, 472 S.E.2d 778, 780 (1996). The defendant asserts that the filed rate doctrine, adopted by North Carolina in *N.C. Steel, Inc. v. National Council*, 123 N.C. App. 163, 170, 472 S.E.2d 578, 581 (1996), *aff'd*, 347 N.C. 627, 496 S.E.2d 369 (1998), stands as a complete bar to the plaintiff's recovery.

{4} Chapter 58 of the North Carolina General Statutes is a comprehensive regulatory scheme for the insurance industry. Under Chapter 58, the Insurance Commissioner has broad powers to set rates and to address violations by insurers. This scheme is designed to place regulatory authority over the insurance business with the administrative agency, which has expert knowledge in the field. The central issue presented by the motion to dismiss is whether the defendant's alleged acts which provide the basis for plaintiff's complaint are acts that the legislature intended to be within the regulatory power of the Insurance Commission. The Court concludes that the plaintiff's claims constitute an assertion that the Insurance Commissioner made an error in the computation of defendant's allowable reserves, and that this resulted in an error in setting the approved rate. Those claims are barred by the filed rate doctrine.

{5} The filed rate doctrine (otherwise known as the *Keogh* doctrine) holds that a plaintiff may not assert a claim for damages "on the grounds that a rate approved by a regulator as reasonable was nonetheless excessive or inadequate because it was the product of unlawful conduct." *N.C. Steel,* 347 N.C. 627, 496 S.E.2d 369 (1998); *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed 183 (1922). Under the filed rate doctrine, once a rate is deemed lawful by the appropriate regulator, that rate determination cannot be challenged other than by a timely direct appeal of the regulator's decision to approve the rate. *N.C. Steel*, 347 N.C. 627, 632, 496 S.E.2d 369, 372 (1998) ("When the Commissioner approved the rates, they became the proper rates . . . . We do not believe that, with this comprehensive regulatory scheme, the General Assembly intended that the rate could be collaterally attacked."). North Carolina applies the filed rate doctrine to the insurance industry. *Id.*

{6} Courts that have adopted the filed rate doctrine have given many reasons for doing so, including: (1) that the agency's authority to determine the reasonableness of the rates must be preserved. (*N.C. Steel*, 123 N.C. App. 163, 169-170, 472 S.E.2d 578, 584-585 (1996), quoting *Wegoland Ltd. V. NYNEX Corp.*, 27 F.3d 17 (2d Cir. 1994) (holding that the filed rate doctrine is necessary because:

> Congress and state legislatures establish regulatory agencies in part to ensure that rates charged by generally . . . oligopolistic industries are reasonable . . . . If courts were licensed to enter this process under the guise of ferreting out . . . [antitrust violations] in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system).

*Id.* at 168; (2) that the agency which regulates the industry involved possesses expertise with regard to that industry, whereas courts do not. *Id*; and (3) the filed rate doctrine promotes uniformity in rate making decisions. *N.C. Steel*, 123 N.C. App. 163.

{7} A review of the Supreme Court's decision in *N.C. Steel* demonstrates that the filed rate doctrine bars the plaintiff's claims in this action. In *N.C. Steel*, the plaintiffs were companies paying workers'

compensation insurance premiums. The plaintiffs alleged that the insurance companies withheld certain evidence from the Commissioner of Insurance about servicing carrier fees for residual market workers' compensation insurance in order to secure approval of excessive rates. The plaintiffs had two theories under which they believed they were entitled to relief. First, plaintiffs argue that since defendants had wrongfully obtained the excessive rate, they were entitled to a refund of the excess premiums paid. The Court of Appeals held (and the Supreme Court affirmed) that because such a refund could only be calculated by determining what the "proper rate" would have been, the filed rate doctrine barred recovery.

{8} Plaintiffs' second theory was based on allegations that the defendants conspired to pay excessive servicing carrier fees, which prevented the premiums from covering losses in the residual market. This resulted in a shortfall, requiring the defendants to use part of the premiums from the voluntary market to cover this loss. The plaintiffs alleged that the defendants' unlawful actions forced the defendants to place more marginal risks in the residual market with its higher premiums. The plaintiffs maintained that, under this theory, it was not necessary to question the rates set by the Insurance Commissioner in order to prove their damages. They argued that the damage to the plaintiffs came from shifting plaintiffs to the residual market, and thus did not depend on a challenge to the rates. *Id.* The Court of Appeals agreed, stating:

> "[T]he filed rate doctrine does not act to bar any claims which involve damages other than inflated rates."
>
> . . . .
>
> We do not believe that plaintiffs' second claim for relief requires the approved rates to be recalculated. Instead, we find that plaintiffs' second claim for relief depends only on the number of employers who were forced to purchase insurance in the residual market by the alleged illegal conduct which would otherwise have been able to purchase insurance in the voluntary market.

*N.C. Steel*, 123 N.C. App. At 172, 173, 472 S.E.2d at 587-588. (1996).

The Supreme Court reversed, holding:

> We believe that the plaintiffs cannot prove their claim without the rates set by the commissioner being questioned. The plaintiffs' damages must come from being shifted from the voluntary market to the residual market. If the plaintiffs offer evidence that a certain number of policyholders who were in the residual market should have been in the voluntary market, the defendants could show that the influx of these policyholders would have caused the Commissioner to set different rates for the two markets. This is a questioning of rates set by the Commissioner, which the filed rate doctrine is designed to prevent.

*N.C. Steel*, 347 N.C. 627, 496 S.E.2d 369. Thus, the Supreme Court made clear that in any case which could result in a recalculation of the insurance rates approved by the Commissioner, the filed rate doctrine applies.

{9} In the instant case, Lupton argues that his claim does not implicate the filed rate doctrine because it is not necessary to re-compute the insurance rate approved by the Commissioner in order to compute subscribers' damages.[fn3] Instead, plaintiff argues, it is only necessary to calculate the amount Blue Cross' reserves exceed their statutory limit. The method of calculation of the statutory reserves in question is set forth in N.C.G.S. §58-65-95 and §58-65-135. N.C.G.S. §58-65-95 provides in part as follows:

> Every [medical service corporation] . . . shall accumulate and maintain . . . a special contingent surplus or reserve at the following rates annually of its gross annual collection of membership dues, exclusive of receipts from cost plus plans, until said reserve shall equal three times its average monthly expenditures for hospital and/or dental claims and administrative and selling expenses:

 (1) First $200,000 . . . . . . . . . . . . . . . 4%

 (2) Next $200,000 . . . . . . . . . . . . . . . 2%

 (3) All above $400,000 . . . . . . . . . . . 1%

N.C.G.S. §58-65-95 (1991). Plaintiff argues that if the proper reserves calculation is done based on defendant's average monthly expenditures, the amount yielded can be subtracted from the reserves at issue, and the class members can be refunded the difference without a recalculation of rates.

{10} This assessment of the situation is incomplete because it fails to acknowledge that the reserves calculation is part of the Insurance Commissioner's calculation of the approved rate.

In addition, the putative class members paid premiums to defendant at the approved rate(s). As provided, the defendant accumulates reserves out of its gross collection of premiums. This is the only form of payment from the putative class to the defendant. Therefore, implicit in their allegation that defendant wrongfully acquired excessive reserves is the allegation that defendant charged excessive premiums to get those reserves. Put another way, Blue Cross could show that a reduction in their reserves would have caused the Commissioner to approve a different rate. This is the same analysis applied by the Supreme Court to bar the plaintiff's second cause of action in *N.C. Steel*. Based on the Supreme Court's holding, plaintiff's claims are barred.

{11} Plaintiff also argues that the method of damage calculation distinguishes his case from *N.C. Steel*. As stated above, the *N.C. Steel* plaintiffs alleged a conspiracy by the defendant insurance companies that led to higher rates than would have been approved "in a competitive residual market." *N.C. Steel* at 636. Thus, according to the *N.C. Steel* plaintiff, the factfinder would have been required to *derive a reasonable rate in the abstract* in order to remedy the wrong caused by the conspiracy. (Plaintiff's Brf. p. 5.) Lupton asserts that his case is distinguishable, and outside the scope of the filed rate doctrine, because the factfinder could recalculate his damages *not in the abstract*, but based on the statutory guidelines. While this distinction may be relevant to the ease of calculating the amount of defendant's allegedly unlawful gain, it does not change the fact that what the plaintiff proposes involves a recalculation of the approved rate.

{12} The *N.C. Steel* Court did not base its decision on the difficulty of recalculating the rate, but rather on the policy that it is not the province of the Court to redetermine an approved rate. The *N.C. Steel* decision makes clear the judicial system's deference to the Insurance Commission on all rate making matters. The fact that plaintiff may have an easier method of computing damages than the *N.C. Steel* plaintiff is irrelevant. Where the damages result in or require a recalculation of the approved rate, the filed rate doctrine bars recovery. *N.C. Steel* and this case both challenge an underlying component of the Commissioner of Insurance's rate determination. If there is an error in determining the underlying component and correction of that error could result in a rate change, those claims should be pursued before the Insurance Commission.

{13} The Commissioner of Insurance has broad powers to determine whether defendant properly calculated its reserve levels and to correct the situation through restitution and/or penalties if the Commissioner determines that defendant did not properly calculate its reserves. Those powers provide an adequate administrative remedy for plaintiff's complaint. See N.C. Gen. Stat. §§ 58-2-40, 58-2-70, and 58-65-95.

## CONCLUSION

{14} The filed rate doctrine exists to prevent courts from intruding on the authority vested in administrative agencies by the legislature. The North Carolina Insurance Commission has been given broad authority by the state legislature to deal with all matters involving rates and rate setting. The allegations in plaintiff's complaint clearly implicate the approved rates. It is impossible to conclude that defendant accumulated excess reserves without questioning the Commissioner's approval of the premium

rates defendant was charging. The plaintiff's proper recourse for questioning those rates is with the Insurance Commission.

{15} It is therefore ORDERED that plaintiff's complaint in both of the above captioned cases is dismissed for failure to state a claim upon which relief may be granted.

This the 14th day of June, 1999.

_____

Footnote 1 Defendant filed various other motions to dismiss contemporaneously with this motion. Since this order is dispositive of the case, the Court does not reach defendant's other motions. The Court notes that the same statutory scheme which supports application of the filed rate doctrine also provides an exclusive remedy which would support dismissal based upon a lack of subject matter jurisdiction pursuant to Rules 12(b)(1) and (h)(3).

Footnote 2 The cases captioned above have been consolidated pursuant to an Order of this Court. The complaints referred to herein are the *Lupton* Complaint (which mirrors the *Giduz* Complaint) and the *Lupton* Amended Complaint. Giduz is no longer a party.

Footnote 3 It is significant to the Court that, while plaintiff argues that a recalculation of the approved rate is unnecessary to compute his damages, plaintiff's original complaint alleged that class members had been damaged by having to pay excessive rates. (Lupton Compl. at paras. 39(c), 49, 50, 51, 53, 58, 60, 61.) Plaintiff later filed an amended complaint that removed all reference to excessive rates, possibly in response to defendant's filed rate doctrine defense. Whatever plaintiff counsel's reasons for amending the complaint, it appears to the Court that plaintiff's counsel initially and quite logically viewed damages in terms of the excess premiums allegedly paid by subscribers as a result of defendant's conduct, indicating that a recalculation of those rates is necessary to reveal plaintiff's damages.