(988 P.2d 1208)

No. 81,028

AMUNDSON & ASSOCIATES ART STUDIO, LTD., d/b/a THE AMUNDSON GROUP, Individually and representing a class of similarly situated persons, *Appellant*, v. NATIONAL COUNCIL ON COMPENSATION INSURANCE, INC., *et al.*, *Appellees*.

Opinion filed September 17, 1999.

*Scott A. McCreight, Steven M. Sprenger,* and *Korey A. Kaul,* of Sprenger & McCreight, L.C., of Kansas City, Missouri, for the appellant.

*Reid F. Holbrook* and *Brent G. Wright,* of Holbrook, Heaven & Osborn, P.A., of Kansas City, and *David H. Bamberger,* of Piper & Marbury, L.L.P., of Washington, D.C., for appellee United States Fidelity and Guaranty Company.

*Jerome T. Wolf* and *Curtis E. Woods,* of Sonnenschein, Nath & Rosenthal, of Kansas City, Missouri, and *Mark F. Horning* and *Shannen W. Coffin,* of Steptoe

& Johnson, L.L.P., of Washington, D.C., for appellees Aetna Casualty & Surety Company and Travelers Insurance Company.

*Floyd R. Finch*, of Blackwell, Sanders, Matheny, Weary & Lombardi, L.L.P., of Kansas City, Missouri, for appellee Houston General Insurance Company.

*Lori R. Schultz*, of Morrison & Hecker L.L.P., of Kansas City, Missouri, for appellee Liberty Mutual Insurance Company.

*David W. Hauber*, of Boddington & Brown, Chtd., of Kansas City, and *David J. Healy*, of Arnold, White & Durkee, of Houston, Texas, for appellees Continental Western Insurance Company and Hartford Underwriters Insurance Company.

*Roger D. Stanton*, of Berkowitz, Feldmiller, Stanton, Brandt, Williams & Stueve, L.L.P., of Kansas City, Missouri, and *James R. Safley*, of Robins, Kaplan, Miller & Ciresi, L.L.P., of Minneapolis, Minnesota, for appellee Employers Insurance of Wausau.

*Edward M. Boyle*, of Payne & Jones, Chartered, of Overland Park, for appellee Commercial Union Insurance Company.

*Robert B. Sullivan* and *Miriam Glueck*, of Polsinelli, White, Vardeman & Shalton, a Professional Corporation, of Overland Park, for appellee Granite State Insurance Company.

*Wyatt A. Hoch* and *Martha Aaron Ross*, of Foulston & Siefkin, L.L.P., of Wichita, *John A. Karaczynski*, of Akin, Gump, Strauss, Hauer & Feld, L.L.P., of Los Angeles, California, and *Kevin J. Arquit* and *Gary R. Carney*, of Rogers & Wells, of New York, New York, for appellee National Council on Compensation Insurance, Inc.

*Leslie A. Greathouse*, of Shughart, Thomson & Kilroy, of Overland Park, R. Lawrence Ward, of Shughart, Thomson & Kilroy, of Kansas City, Missouri, and *Richard G. Parker*, of O'Melveny & Myers, L.L.P., of Washington, D.C., for appellee Insurance Company of North America.

*William R. Sampson* and *Timothy M. O'Brien*, of Shook, Hardy & Bacon, L.L.P., of Overland Park, and *James P. Kleinberg*, of McCutchen, Doyle, Brown & Enerson, L.L.P., of San Jose, California, for appellees Fireman's Fund Insurance Company and National Surety Corporation.

*William R. Sampson* and *Timothy M. O'Brien*, of Shook, Hardy & Bacon, L.L.P., of Overland Park, and *Stanley B. Block*, of Vedder, Price, Kaufman & Kammholz, of Chicago, Illinois, for appellee Continental Insurance Company.

*Wyatt A. Hoch* and *James D. Oliver*, of Foulston & Siefkin L.L.P., of Wichita, for amici curiae American Insurance Association, Alliance of American Insurers, and National Association of Independent Insurers.

Before PIERRON, P.J., RULON, J., and ROVERT J. FLEMING, District Judge, assigned.

PIERRON, J.: Amundson & Associates Art Studio, Ltd. (Amundson) appeals from the district court's dismissal of its cause of action for failure to state a claim upon which relief may be granted. Amundson filed a class action lawsuit against the National Council on Compensation Insurance, Inc., and a number of insurance companies (collectively NCCI) challenging their conduct in managing the "residual" market for workers compensation insurance in Kansas. Amundson alleges that NCCI violated the Kansas Antitrust Act by conspiring to fix costs associated with the residual market.

Amundson and the class of similarly situated persons it represents are Kansas employers. Kansas employers are generally required to purchase workers compensation insurance to protect their employees. See K.S.A. 1998 Supp. 44-532(b).

There are at least two bodies of employers purchasing workers compensation insurance in Kansas. The majority of employers purchase workers compensation insurance in the "voluntary market." In the voluntary market, employers purchase the insurance at the prevailing rate, based upon their individual circumstances. Employers who are considered high risk are typically unable to purchase workers compensation insurance in the voluntary market because of the nature of their businesses, their injury record, and the increased risk of insuring them. To remedy this problem, the legislature has mandated that every insurance company writing workers compensation insurance in Kansas participate in a plan for the equitable apportionment of these high risk employers. K.S.A. 40-2109. Such a plan is known as the involuntary or "residual" market.

NCCI is a corporation owned and operated by its 700 member insurance carriers. NCCI is an insurance "rating organization" licensed in Kansas to develop and file proposed rates for the insurance commissioner's approval. NCCI proposes rates that will be charged to employers within the residual market. The plan used in Kansas for the equitable apportionment of these high risk employers was promulgated by NCCI.

The rates proposed by NCCI are filed with the insurance commissioner, who has the authority to approve, reject, or modify the rates.

NCCI delegates responsibility for the daily administration of the risks written in the residual market to certain insurers known as "servicing carriers." The residual market imposes significant risk on insurers because employers insured in the residual market generally have worse loss experience than employers who are able to obtain coverage in the voluntary market. In order to mitigate these risks, most insurers in Kansas have entered into a contractual arrangement known as the National Workers' Compensation Reinsurance Pool.

NCCI selects certain insurers to act as servicing carriers. These servicing carriers accept the risks required by the plan, thereby fulfilling the obligation of all pool participating companies. The servicing carriers issue policies, collect premiums, investigate and pay claims, and provide other services to residual market policyholders. The servicing carriers then reinsure 100 percent of their assigned risks with the pool companies. By this means, the servicing carriers avoid liability themselves for any loss sustained by the employers in the residual market. Any loss experienced in the residual market is allocated to every insurer writing workers compensation insurance in Kansas, based on each company's market share. The cost of losses experienced in the residual market and allocated to each insurer writing workers compensation insurance is treated as an expense in setting a company's rates.

As compensation for performing their duties, these service carriers are awarded fees (a servicing carrier allowance) in the form of a percentage of the premiums paid by the employers purchasing insurance in the residual market. In the past, NCCI has had complete discretion in picking the servicing carriers and determining the rate of compensation paid to them. NCCI has not chosen the servicing carriers based upon a competitive bidding process.

Amundson alleges that the servicing carrier allowance was excessive because NCCI selected servicing carriers and determined the allowance by mutual agreement rather than by competitive bidding. Amundson also alleges that NCCI conspired with the other defendants to systematically and fraudulently understate the net operating gain and/or overstate the net operating loss for the residual market. Amundson alleges rates are forced up by the use

of the servicing carrier fees, which are undisclosed noncompetitive expenses, and loss factors that would have been demonstrably lower in a competitive residual market, thereby adversely affecting purchasers of workers compensation insurance in both the voluntary and residual markets.

Amundson contends a competitive bidding environment for the selection of the servicing carriers would reduce the overall rates in both markets.

Amundson filed a petition alleging damages as a result of the price-fixing conspiracy among the defendants. The first count asserted a violation of the Kansas antitrust laws, K.S.A. 50-101 *et seq.*, and sought treble damages under K.S.A. 50-801(b). The remaining counts alleged common-law fraud, unjust enrichment, and a civil conspiracy, and requested compensation, fees and costs, and an injunction prohibiting further illegal conduct. NCCI removed the case to federal court, which remanded it to state court for lack of subject matter jurisdiction.

NCCI filed a motion to dismiss based primarily on the "filed rate doctrine." The district court agreed and concluded that Amundson's allegations were an impermissible collateral attack on rates approved by the insurance commissioner and thus barred by the filed rate doctrine. The court stated that to allow Amundson to challenge the rates under the provisions of the antitrust law would infringe upon the authority of the insurance commissioner. The court indicated that no matter how Amundson framed the issue, it was challenging the rates established by the insurance commissioner.

Amundson argues the district court erred in granting NCCI's motion to dismiss based on the filed rate doctrine.

Our review of a motion to dismiss is clearly established. When a motion to dismiss under K.S.A. 60-212(b)(6) raises an issue concerning the legal sufficiency of a claim, the question must be decided from the well-pleaded facts of plaintiff's complaint. A court must accept the plaintiff's description of the events, along with any inferences reasonably to be drawn therefrom. However, this does not mean the court is required to accept conclusory allegations on the legal effects of events the plaintiff has set out if these allegations

do not reasonably follow from the description of what happened or if these allegations are contradicted by the description itself. Dismissal is justified only when the allegations of the petition clearly demonstrate plaintiff does not have a claim. See *Grindsted Products, Inc. v. Kansas Corporation Comm'n*, 262 Kan. 294, 302-03, 937 P.2d 1 (1997).

Amundson first argues the express language of the Kansas antitrust statutes explicity allows an action for antitrust against entities that attempt to control the cost or rates of insurance. K.S.A. 50-101 *Second* defines a trust to be a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, "[t]o increase or reduce the price of merchandise, produce or commodities, or to control the cost or rates of insurance."

K.S.A. 50-112 provides that all trusts, combinations, and agreements in restraint of trade and free competition are unlawful, including such trusts "between persons or corporations, designed or which tend to . . . control the cost or rate of insurance." Entities violating these sections are subject to suit seeking actual damages, treble damages, and reasonable attorney fees. See K.S.A. 50-108, 50-115, and 50-801(b).

Amundson contends that NCCI conspired to control the cost or rates of workers compensation insurance by fixing the fees paid to NCCI's servicing carriers at levels far in excess of those that would exist under a competitive system. Applying statutory rules of construction, Amundson argues the plain and unambiguous language of the Kansas antitrust statutes permit its cause of action and the district court's failure to follow the statutes is grounds for reversal. Amundson directs our attention to the fact there are no statutory provisions excepting insurance from antitrust actions either in the antitrust statutes or the statutes regulating insurance and workers compensation. Without an express exemption, Amundson relies on the well-settled law that immunity from the antitrust laws is not lightly implied and is strongly disfavored. See *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372, 35 L. Ed. 2d 359, 93 S. Ct. 1022 (1973), and *U. S. v. Philadelphia Nat. Bank*, 374 U.S. 321, 348, 10 L. Ed. 2d 915, 83 S. Ct. 1715 (1963).

Amundson insists the filed rate doctrine cannot be applied in this case without rendering the Kansas antitrust statutes wholly inapplicable to insurance rates.

The purpose of regulating the workers compensation rates is to "protect policy holders and the public against the adverse effects of excessive, inadequate or unfairly discriminatory rates." K.S.A. 1998 Supp. 40-951(a). However, the rating laws are also intended to "encourage, as the most effective way to produce rates that conform to the standards of paragraph (a), independent action by and reasonable price competition among insurers." K.S.A. 1998 Supp. 40-951(b). The parties rely on similar language in K.S.A. 40-1111(a) and 40-1112(c). These statutes were repealed in 1997. But NCCI points out that these statutes were only changed in location, not substance, and can now be found in K.S.A. 1998 Supp. 40-951 *et seq.*

Amundson argues an injunction ordering NCCI to change its selection of servicing carriers and granting treble damages to the plaintiffs will not affect the insurance commissioner's ability to approve rates in the voluntary market and will not frustrate any previous rate decision by the insurance commissioner.

We recognize the express language in the Kansas antitrust statutes prohibiting the control of insurance costs or rates. However, the Kansas antitrust statutes were passed in 1897 at a time when Kansas laws did not provide for the regulation of insurance rates. See L. 1897, Ch. 265; R.S. 1923, 50-101 *et seq.* The workers compensation insurance rating laws were passed in 1927. See L. 1927, Ch. 231, 40-1106. With the enactment of the insurance rating laws, the Kansas Legislature gave the insurance commissioner, not the marketplace, the power to control insurance and insurance companies. "It is a settled rule of statutory construction that where an irreconcilable conflict exists between statutes, the latest enactment will be held to supersede, repeal or supplant the earlier by implication; the later enactment must prevail." *Richards v. Etzen*, 231 Kan. 704, Syl. ¶ 1, 647 P.2d 1331 (1982).

The Kansas Legislature has given the insurance commissioner the authority to administer all laws relating to insurance and insurance companies; included therein is the duty of setting or ap-

proving insurance rates. K.S.A. 40-102. The insurance commissioner is deemed to have the expertise to determine proper rates. See K.S.A. 40-102 and K.S.A. 1998 Supp. 40-110. The Kansas Workers Compensation Act, K.S.A. 44-501 *et seq.*, contains a comprehensive regulatory scheme for insurance companies, including provisions for punishing violators of the act. See K.S.A. 44-563 ("For any violation of the provisions of this act the commissioner of insurance may suspend or revoke the authority of any insurance carrier to do business in this state.").

The Kansas insurance code also contains a comprehensive scheme for the insurance commissioner to regulate, control, and establish rates, and guard against excessive, inadequate, or unfairly discriminatory rates. K.S.A. 40-101 *et seq.* Further, the insurance code provides that all decisions and findings of the insurance commissioner are subject to review in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions. K.S.A. 40-251(b); K.S.A. 40-778.

We also note that the Kansas Legislature has authorized cooperation among rating organizations and insurers, which tends to be in direct conflict with principles of antitrust. It is also clear the insurance commissioner has strict control over these cooperative activities in order to prevent violations of the insurance code. K.S.A. 1998 Supp. 40-956(e) provides:

"Cooperation among rating organizations or among rating organizations and insurers in rate making or in other matters within the scope of this act is hereby authorized, provided the filings resulting from such cooperation are subject to all the provisions of this act which are applicable to filings generally. The commissioner may review such cooperative activities and practices and if, after a hearing, the commissioner finds any such activity or practice is unfair, unreasonable or otherwise inconsistent with this act or other provision of the insurance laws of this state, the commissioner may issue a written order requiring discontinuance of such activities or practices."

We do not believe that with these comprehensive regulatory schemes the Kansas Legislature intended that the approved rates could be collaterally attacked. In this case, the insurance code, in conjunction with the filed rate doctrine, supersedes the Kansas Antitrust Act.

Amundson argues we should decline to find the filed rate doctrine creates an exemption from the Kansas antitrust statutes. The filed rate doctrine, also called the "Keogh doctrine," originated in the United States Supreme Court case of *Keogh v. C. & N. Ry. Co.*, 260 U.S. 156, 67 L. Ed. 183, 43 S. Ct. 47 (1922), where a private shipper claimed that rates filed with and approved by the Interstate Commerce Commission (ICC) had been fixed by a conspiracy, and, as a result, the rates "were higher than the rates would have been, if competition had not been thus eliminated." 260 U.S. at 160. The defendants countered that the ICC's approval conclusively established that the rates were "reasonable and nondiscriminatory," and the *Keogh* court agreed. The court held that the plaintiff could not recover damages under the federal antitrust statute based on the claim that it would have paid lower rates absent the defendants' conspiracy to fix rates. 260 U.S. at 162.

The *Keogh* court based its decision on four rationales. First, under the Interstate Commerce Act, shippers injured by the price-fixing conspiracy could recover their damages in proceedings before the ICC. The court assumed Congress did not intend to provide a duplicative remedy under the Sherman Antitrust Act. Second, the *Keogh* court stated that granting a recovery only to those shippers that chose to sue could result in a discriminatory rate structure, because the successful litigants effectively would pay a lower rate than other shippers. Third, the court was concerned that antitrust damages would require calculation of a hypothetical lower rate, along with proof that such a lower rate would be adopted by the ICC. The court stated that whether this rate would be approved by the ICC should be left to the agency itself, rather than the courts. Last, the *Keogh* court stated that the plaintiff shipper had suffered no injury because it was able to simply pass along the overcharges to its customers. 260 U.S. at 162-65.

We agree with the district court's rationale in accepting and applying the filed rate doctrine to dismiss Amundson's claim. The filed rate doctrine bars antitrust suits alleging competitive injury resulting from the payment of a rate filed with a federal regulatory agency. See *Keogh*, 260 U.S. at 162; *Arkansas Louisiana Gas Co.*

*v. Hall*, 453 U.S. 571, 577, 584, 69 L. Ed. 2d 856, 101 S. Ct. 2925 (1981).

The filed rate doctrine has been held to apply equally to rates filed with state agencies. See *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994) ("the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies"); *Taffet v. Southern Co.*, 967 F.2d 1483, 1494 (11th Cir.), *cert. denied* 506 U.S. 1021 (1992) ("this principle, which is central to the filed rate doctrine . . . , applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one"); *H.J. Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485, 494 (8th Cir.), *cert. denied* 504 U.S. 957 (1992) ("the rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency").

The filed rate doctrine stands for the proposition that because an administrative agency is vested with the authority to determine what rate is just and reasonable, courts should not adjudicate what a reasonable rate might be in a collateral lawsuit. See *Montana-Dakota Co. v. Pub. Serv. Co.*, 341 U.S. 246, 250-51, 95 L. Ed. 912, 71 S. Ct. 692 (1951); *Wegoland*, 27 F.3d at 19.

Amundson relies on Judge Friendly's refutation of each of the rationales in *Keogh* in the case of *Square D. Co. v. Niagra Frontier Tariff Bur.*, 760 F.2d 1347 (2d Cir. 1985), *aff'd*, 476 U.S. 409, 90 L. Ed. 2d 413, 106 S. Ct. 1922 (1986), for authority that this court should reject *Keogh*. The glaring quandary with *Square D* is that although Judge Friendly seemingly eviscerated the rationale in *Keogh*, the court still followed the doctrine due to stare decisis.

Amundson argues that *Keogh* is a weak and discredited doctrine that continues to exist at the federal level only through stare decisis. Amundson contends that in this case of first impression, this court should not extend the *Keogh* holding beyond its original boundaries where it has retained life at the federal level only in the narrow circumstances of its original decision and it should not be utilized to override Kansas' antitrust statutes. The court in *Capital Freight Serv. v. Trailer Marine Transport*, 704 F. Supp. 1190, 1195 (S.D.N.Y. 1989) stated:

"Although the Supreme Court's ruling in *Square D* saved *Keogh* from extinction, it did not breathe a new expansive energy into the doctrine. The decision represents simply an unwillingness to deliver a coup de grace to a weak and forcefully criticized doctrine because that function might be more appropriately carried out by Congress."

Amundson cites *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 18 Cal. Rptr. 2d 308 (1993), for supporting authority that other courts have rejected *Keogh*. There, the California court refused to expand the *Keogh* doctrine to apply to causes of action brought under California's antitrust statute where individual consumers and corporate sales agents brought a wholesale and retail price fixing action against providers of cellular telephone service. The court reiterated the weakness of *Keogh* as stated by Judge Friendly in *Square D*. The court then added six additional reasons for refusing to extend the *Keogh* doctrine. 14 Cal. App. 4th at 1241-42.

Amundson applies these six reasons to the case at bar. First, the Kansas antitrust act, similar to California's Cartwright Act, is broader than the Sherman Antitrust Act, since it expressly applies to the business of insurance. See K.S.A. 50-101 *Second*; 14 Cal. App. 4th at 1242; 15 U.S.C. §§ 1011-15 (1994). Second, *Keogh* dealt with the ICC's regulation of common carriers, whereas here, a different statutory scheme is involved in the insurance commissioner's regulation of insurance. Third, because of the procedural posture of the case, it must be presumed that regulating the servicing agreements would benefit the plaintiffs by lowering rates. Fourth, the *Cellular Plus* court concluded that "the *Keogh* court focused on whether the common carrier rates were illegal under the ICC statutes and regulations, whereas Cellular Plus does not argue the rates charged were not duly approved and legal under PUC [the California Public Utilities Commission] regulations, but it focuses on the alleged wrongful acts in fixing prices." 14 Cal. App. 4th at 1242. Here, Amundson similarly alleges that it does not contest the legality of the rates, but rather that NCCI illegally conspired to fix prices paid to the servicing agents. Fifth, *Keogh* and the current case are similar in that both deal with claims with individual consumers, not the insurance companies (a factor in

NCCI's favor). Sixth, the *Cellular Plus* court stated that the PUC desired the cellular telephone service industry to be as freely competitive as possible, whereas the ICC in *Keogh* and *Square D* appeared to be more concerned about price uniformity and nondiscrimination than competition. 14 Cal. App. 4th at 1242.

Amundson states that it is undisputed that NCCI's servicing carrier agreements have never been filed with, reviewed by, or approved by the insurance commissioner. Amundson argues the insurance commissioner is by necessity ignorant of the price-fixing conspiracy of NCCI, and has never approved or endorsed that conspiracy. Amundson suggests that if NCCI escapes liability, then other regulated entities will be encouraged to engage in price-fixing knowing that the conduct will escape review.

We agree with NCCI that the filed rate doctrine, although not heretofore applied in Kansas by name, has nevertheless been recognized in principle. *Christl v. Railway Co.*, 92 Kan. 580, 585, 141 Pac. 587 (1914) (shipper bound by tariffs filed and published in accordance with the interstate commerce law); *Schenberger v. Railroad Co.*, 84 Kan. 79, 81, 113 Pac. 433 (1911) (The schedule of rates published and filed with the interstate commerce commission must govern. Any claim that such rate is unjust must be presented to that tribunal.); *Railway Co. v. Refining Co.*, 83 Kan. 732, 734, 112 Pac. 604 (1911) (regulated entity seeking relief from an allegedly unreasonable rate must obtain redress from the rate regulator, not the courts).

A certain level of deference to an agency's expertise in performing the functions assigned by the legislature is not a new concept in Kansas. The court in *Southwestern Bell Tele. Co. v. State Corporation Commission,* 192 Kan. 39, 48-49, 386 P.2d 515 (1963), emphasized that courts are ill-equipped to second guess a rate regulator's determination of a reasonable rate:

" 'Where [the Kansas Corporation Commission's] findings of fact are based upon substantial evidence and the other matters shown by the record with which that tribunal is authorized to deal, a court is not justified in setting its orders aside because the record shows that a different order or decision than the one made by the commission could fairly have been based thereon.' (Citation omitted.)"

"The Commission's decisions involve the difficult problems of policy, account-ing, economics and other special knowledge that go into rate making. It is equipped with a staff of assistants, with experience as statisticians, accountants and engineers. The courts have no comparable suitability for making the deter-mination."

Regardless of whether the filed rate doctrine is seen to protect the consumer or the competitor, it preserves the integrity of the agency's decision. An award of antitrust or common-law damages (the equivalent of a rate refund) or the granting of injunctive relief (the equivalent of a rate reduction) would undermine such rate regulatory schemes by allowing a jury or court to intrude upon the insurance commissioner's authority to determine the reasonable-ness of filed rates. The agency's authority would be frustrated be-cause an award of damages or equitable relief would necessitate the substitution of the court's or jury's judgment for the insurance commissioner's expert determination of rate reasonableness. The filed rate doctrine prevents this result by barring such nonadmin-istrative collateral attacks on approved rates.

Amundson makes much of the fact that the insurance commis-sioner did not review the servicing carrier agreements in setting the rates and, thus, there is no diminishing of the commissioner's authority or possibility of duplicative or inconsistent standards. We believe this is a good example of why questions involving rates should be settled by the insurance commissioner and not a jury. Whether the payment of the servicing carrier fees is a relevant factor which must be considered by the commissioner in setting rates pursuant to K.S.A. 1998 Supp. 40-954 is a technical question which requires considerable expertise to answer. It is best decided by the commissioner, who has this expertise. It should not be de-cided by a court or jury, which does not have this expertise.

Amundson disagrees with the argument that the filing of rates by insurers in the voluntary market means the insurance commis-sioner has approved NCCI's servicing carrier agreements. Amund-son maintains the mere filing of rates with the insurance commis-sioner does not place the agency's imprimatur on all conduct that affect the level of those rates. Rather, Amundson contends that if the insurance commissioner reviewed the rates filed by the vol-

untary market insurers, the commissoner at most determined that the rates filed by the nonparty insurers met the minimum statutory requirements of being "reasonable, adequate and not unfairly discriminatory." K.S.A. 40-1112(d). The insurance code implies otherwise.

K.S.A. 1998 Supp. 40-955(e) provides that in reviewing a rate filing, "the commissioner may require the insurer or rating organization to provide, at the insurer's or rating organization's expense, all information necessary to evaluate the reasonableness of the filing." K.S.A. 44-562 also provides:

"Every insurance carrier writing insurance for liability hereunder, or the liability of employers rejecting this act, shall report to the commissioner of insurance, in accordance with such rules as he may adopt, such information as he may at any time require for the purpose of determining the solvency of the carrier or the fairness, reasonableness and adequacy of its rates, and for such purposes the commissioner of insurance may inspect the books and records of such carriers and examine its officers, agents and servants under oath."

Due to these statutes, we can assume the insurance commissioner is familiar with the servicing carrier process and has approved the subject rates.

We find the decision of *N.C. Steel, Inc. v. National Council on Compensation Ins.*, 347 N.C. 627, 496 S.E.2d 369 (1998), to be persuasive. There, the plaintiffs, like Amundson, claimed that "rates are forced up by the use of the servicing carrier fees, which are undisclosed noncompetitive expenses . . . thereby adversely affecting purchasers of workers' compensation insurance in both the voluntary and residual markets." 347 N.C. at 631. The North Carolina Supreme Court affirmed the dismissal of this claim, reasoning that:

"The General Assembly has given the Insurance Commissioner the duty of setting rates. The Commissioner, aided by his staff, has the expertise to determine proper rates. We do not believe that, by the enactment of [the North Carolina antitrust law], the General Assembly intended that duly set rates be challenged in another forum. When the Commissioner approved the rates, they became the proper rates.

"[The North Carolina Insurance Code] contains a comprehensive regulatory scheme for insurance companies, which includes provisions for punishing violators of the chapter. (Citation omitted.) It also contains a provision for the appeal of decisions of the Commissioner. (Citation omitted.) We do not believe that, with

this comprehensive regulatory scheme, the General Assembly intended that the rates could be collaterally attacked." 347 N.C. at 632.

The case at bar is also similar to *Uniforce Temp. Personnel v. National Council*, 892 F.Supp. 1503 (S.D.Fla. 1995), *aff'd*, 87 F.3d 1296 (11th Cir. 1996), which involved a claim that the ratepayers were improperly insured in the residual market and thus forced to pay higher rates than they would have if they had obtained insurance in the voluntary market. The employers claimed that the defendant-insurance carriers conspired to fix excessively high servicing carrier fees, which resulted in the employers' being forced to purchase insurance in the residual market instead of the voluntary market. The *Uniforce* court determined the "plaintiffs' claims for damages [fell] squarely within the filed rate doctrine." 892 F. Supp. at 1512. A jury in the present case, similar to the jury in *Uniforce*, would have had

"to measure the difference between the properly approved workers' compensation insurance rates paid by plaintiffs and those mythical rates which would have been applicable but for the defendants' concerted activity. This undertaking is not within the province of the courts but should reside with the respective state regulators with authority over rate-setting." 892 F. Supp. at 1512.

We agree with the district court that Amundson was injured, if at all, only to the extent that the insurance companies that paid the servicing carrier fees passed those fees to their insureds in the form of higher rates. If Amundson paid a higher rate, it was an approved rate. If proposed rates are filed with and approved by the insurance commissioner, the filed rate doctrine applies notwithstanding any allegation that the rates were affected by nonrate conduct or that such nonrate conduct was not regulated by the insurance commissioner. The insurance commissioner has the sole power of regulating the rates and that power includes examining any information deemed necessary to determine the excessiveness or adequacy of the rates.

Next, Amundson contends that even if we adopt the filed rate doctrine, it does not apply in this case. Amundson argues the *Keogh* doctrine applies only when a governmental agency has jurisdiction over and approves the allegedly anticompetitive conduct. Amund-

son argues that since it is undisputed that NCCI's servicing carrier agreements were never filed with, reviewed by, or approved by the insurance commissioner, then the *Keogh* doctrine does not apply.

In *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386 (9th Cir. 1992), the plaintiff alleged a conspiracy to fix price levels for title search and examination services. The court rejected the defendant's reliance on the *Keogh* doctrine.

"Ticor makes much of the fact that the filed rates are the only rates which it may legally charge in Arizona and Wisconsin. However, if those rates were the product of unlawful activity prior to their being filed and were not subjected to meaningful review by the state, then the fact that they were filed does not render them immune from challenge. The absence of meaningful state review allows the insurers to file any rates they want. Therefore, the act of filing does not legitimize a rate arrived at by improper action." 982 F.2d at 393-94.

Amundson's claims that the *Keogh* doctrine does not apply because the insurance commissioner has no control over the servicing carrier agreements also fails. As previously discussed, the insurance commissioner has control over any and all information in determining whether the proposed rates are excessive, inadequate or unfairly discriminatory. See K.S.A. 1998 Supp. 40-955(e); K.S.A. 44-562. No matter how the issue is stated, Amundson is ultimately challenging the rates as established by the insurance commissioner. The district court correctly concluded: "However framed by the plaintiff the claim is an attack on the rate levels previously approved by the commissioner." Any claim of price-fixing or misstatement of losses or gains is a collateral attack on the reasonableness of the approved rate.

Last, Amundson argues the district court erroneously dismissed its claim for injunctive and declaratory relief along with the rest of the case without addressing the issue of whether the *Keogh* doctrine barred such claims. It contends the filed rate doctrine does not bar a claim for injunctive relief. In *Keogh*, the court stated: "[U]nder the Anti-trust Act a combination of carriers to fix reasonable and nondiscriminatory rates may be illegal, and if so, the Government may have redress by criminal proceedings . . . [or] by injunction." 260 U.S. at 161.

Amundson relies on *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 89 L. Ed. 1051, 65 S. Ct. 716 (1945), which applied *Keogh* to bar the State of Georgia's claim for treble damages, but allowed the claim for injunctive relief. Amundson maintains the Court's holding that Georgia sought to enjoin the conspiracy, and not the approved rates, applies equally to the case at bar. See 324 U.S. at 455. Amundson also relies on a sentence in *Square D.*, 476 U.S. at 422, where the Court stated: "The alleged collective activities of the defendants . . . were subject to scrutiny under the antitrust laws by the Government and to possible criminal sanctions or equitable relief."

We find Amundson's claims to be without merit. Any claim for injunctive or equitable relief in this area is permissible by the *government*, not individuals. See *N.C. Steel*, 347 N.C. at 636 ("We are not bound by the United States Supreme Court's ruling as to equitable relief. Nevertheless, we believe the two sentences [in *Keogh* and *Square D.*] relied upon by the plaintiffs say it is the government, and not individuals, that is entitled to equitable relief.").

By this decision we do not rule on the issue as to whether the Kansas Antitrust Act is never applicable to the insurance industry by private parties. NCCI argues, and may be correct, that there may be appropriate application of our antitrust laws in the insurance area by private parties. We need not reach that issue in this case.

Affirm.