697 S.E.2d 527

**TEMPORARY SERVICES, INC.,** on behalf of themselves and all others similarly situated; and **Charleston Steel & Metal Company,** on behalf of themselves and all others similarly situated, **Plaintiffs,**

v.

**AMERICAN INTERNATIONAL GROUP, INC.;** American Home Assurance Company; Commerce and Industry Insurance Company; National Union Fire Insurance Company of Pittsburgh, PA; and American International Underwriters Corporation, **Defendants.**

No. 26835.

Supreme Court of South Carolina.

Heard June 9, 2010.

Decided July 19, 2010.

James K. Holmes, of Steinberg Law Firm, of Charleston; Richard A. Harpootlian and Graham Lee Newman, both of Columbia, and Mark D. Chappell, J. Richards McCrae, III, W. Hugh McAngus, Jr., all of Chappell, Smith & Arden, of Columbia, for Plaintiffs.

Stephen G. Morrison, Robert H. Brunson, and Jay T. Thompson, all of Nelson Mullins Riley & Scarborough, of Columbia, and Michael B. Carlinsky, Kevin S. Reed, Jennifer J. Barrett, Safia G. Hussain and Lee Katherine Turner, all of Quinn Emanuel Urquhart & Sullivan, of New York, New York, for Defendants.

Chief Justice TOAL.

In this matter, the United States District Court for the District of South Carolina has certified two questions regarding the applicability of the filed rate doctrine to Plaintiffs' claims.

### FACTS/PROCEDURAL BACKGROUND

The underlying lawsuit was filed by Temporary Services, Inc. and Charleston Steel and Metal Company (Plaintiffs)

against American International Group, Inc., Commerce and Industry Insurance Company, and American Home Assurance Company (Defendants). Plaintiffs have asserted seven claims of breach of contract against Defendants stemming from workers' compensation insurance policies procured by Plaintiffs from Defendants. Plaintiffs allege that Defendants have committed material breaches of these policies by fraudulently charging excessive premiums.

In determining the rates applicable to insurance policies, carriers utilize a calculation based on a combination of two criteria: a pure loss component (LC) and an expense component, or loss cost multiplier (LCM). The LC is an industry-wide calculation of projected claims as to each specific job description. The LCM is a multiplier applied to the premium rate based on an insurer's specific expenses. The expenses relevant to the LCM include items such as acquisition costs, overhead, taxes, and profit. S.C.Code Ann. § 38–73–1400 (2002). Plaintiffs allege Defendants fraudulently calculated their LCM, which was submitted to the Department of Insurance (DOI) in 2001, in order to charge excessively high premiums.

The questions certified to this Court concern how, if at all, the Filed Rate Doctrine applies to Plaintiffs' claims. The Filed Rate Doctrine was adopted by this Court in the case of *Edge v. State Farm Mutual Insurance Company,* 366 S.C. 511, 623 S.E.2d 387 (2005), and "was originally a federal preemption rule which provided that rates duly adopted by a regulatory agency are not subject to collateral attack in court."

## ISSUES

■ The United States District Court for the District of South Carolina has certified the following two questions to this Court:

I. Under South Carolina law, were the Defendants' submissions to the DOI in 2001 "filed rates" within the meaning of the Filed Rate Doctrine as adopted by this Court in *Edge*?

II. Does South Carolina recognize an exception to the Filed Rate Doctrine that permits a private plaintiff to

avoid the Filed Rate Doctrine by alleging that regulatory approval for the rate was obtained through fraudulent means, or must a private plaintiff seek remedies solely through administrative channels?

LAW/ANALYSIS

## I. Applicability of Filed Rate Doctrine to Plaintiffs' Claims

Plaintiffs argue the Filed Rate Doctrine does not bar its claims. We agree.

The Filed Rate Doctrine "stands for the proposition that because an administrative agency is vested with the authority to determine what rate is just and reasonable, courts should not adjudicate what a reasonable rate might be in a collateral lawsuit." *Edge,* 366 S.C. at 517, 623 S.E.2d at 391 (quoting *Amundson & Assocs. Art Studio v. Nat'l Council on Comp. Ins.,* 26 Kan.App.2d 489, 988 P.2d 1208, 1213 (1999)). The DOI was not vested with the authority to determine the rates applicable to the workers' compensation policies at issue, thus the Filed Rate Doctrine does not bar Plaintiffs' claims in this instance.

A brief examination of the regulatory scheme applicable to workers' compensation policies provides the necessary context to understand the issues before this Court. Generally, the DOI is vested with the authority to regulate the insurance industry. For regulatory purposes, there are three categories of workers' compensation insurance that employers can maintain: self-insurance, assigned risk insurance, and voluntary insurance. The workers' compensation insurance at issue is voluntary insurance.

Each category of workers' compensation insurance is regulated in a different manner by the DOI. An examination of the regulatory scheme applicable to the self-insurance category is irrelevant to our understanding of the issues before the Court. However, an understanding of the regulation of assigned risk insurance and voluntary insurance is necessary to properly contextualize the Federal Court's certified questions.

Generally, those employers participating in the assigned risk program are high-risk insureds that were unable to

procure insurance in the open market. In contrast, those employers participating in the voluntary program were able to acquire insurance on the open market. The differences in the nature of these programs are reflected in their respective regulation. In 1989, the General Assembly established a rating system for the assigned risk insurance and voluntary insurance programs. As briefly explained before, the rates in both programs are calculated by the use of two categories of data: the LC and the LCM.[1] The LC is derived by the National Council of Compensation Insurers (NCCI) and submitted to the DOI for approval. The LCM differs from the LC in that it is not industry wide or calculated by a rating agency but is carrier-specific and calculated using figures for expenses and profits each individual carrier incurs in the market.

Beginning in 1990, the DOI differentiated between the voluntary and assigned risk programs as to how the "expense component," or LCM, would be developed and who would file this information. Section 38–73–1380 provides for the LCM to be "filed with the department and approved by the director or his designee, by each member or subscriber of a rating organization independently." The DOI, however, utilized the discretion given to it under section 38–73–1430 to mandate that the rating organization

> file a proposed expense component for the Assigned Risk
> Plan reflecting the cost of the Assigned Risk Plan only,

---

1. The "pure loss component," which is another term for LC, is comprised of:

> [t]hat portion of the final rate or premium charge applicable to calendar/accident year incurred losses (the sum of paid losses plus loss reserves including incurred but not reported loss reserves) and loss adjustment expense (those expenses directly related to the payment of claims) in this State, trended to include both the past and prospective loss experience.

S.C.Code Ann. § 38–73–1400(1).

The "expense component," which is another term for LCM, is comprised of:

> that portion of the final rate or premium charge applicable to production costs (including commissions and other acquisition expenses), underwriting costs, administrative costs (including the actual costs of taxes, licenses and fees), and profit margin in this State.

S.C.Code Ann. § 38–73–1400(2).

which, when approved, will be added to the approved pure loss component for the Assigned Risk Plan to become the final rate for the Plan.

Department of Insurance Bulletin No. 1990–05.

Thus, after the inception of the rating system in 1990, workers' compensation insurance rates were to be established uniformly throughout the assigned risk program. In contrast, however, insurers in the voluntary program market relied on rating agencies for the LC used in calculating their rates, but developed and filed their own LCM. The Administrative Law Court recognized this change by stating that "[e]ach carrier determines its own final rates in the voluntary program by combining its own expenses with the loss costs." *NCCI v. SCDOI, et. al.,* 05–ALJ–09–0355–CC (S.C. Admin L. Ct.2005) (http://www.scalc.net/decisions.aspx?q=4&id=8127#_ftn1) (last visited June 2, 2010). Nonetheless, within its bulletin establishing a two-tiered rating system, the DOI mandated that all insurers filing proposed LCM figures, including those in the voluntary insurance market, "shall include the necessary information required by 'SCID Form No. 2007,' . . . and all data necessary to support the filing." Department of Insurance Bulletin No. 1990–05. These filings were subject to public hearing.

The deregulation of the voluntary insurance program continued when, in 2000, the General Assembly altered the filing and review requirements for workers' compensation insurers seeking deviations from their previously-approved premiums. The General Assembly introduced the definition of "exempt commercial policies" to the rating scheme in 2000 Act No. 235. Exempt commercial policies were defined as insurance contracts:

> . . . for large commercial insureds where the total combined premiums to be paid for these policies for one insured is greater than fifty thousand dollars annually and as may be further provided for in regulation or in bulletins issued by the director. Exempt commercial policies include all property and casualty coverages except for commercial property and insurance related to credit transaction written through financial institutions.

S.C.Code Ann. § 38–1–20(40) (2002). The definition of casualty insurance includes workers' compensation insurance. *Id.*

§ 38–1–20(9). Thus, workers' compensation insurance policies are exempt commercial policies.

The General Assembly provided that "[e]xempt commercial policies are not subject to prior approval by the [DOI]." Act No. 235, 2000 S.C. Acts 1683, § 8 (codified as S.C.Code Ann. § 38–73–910(G) (2002)). The General Assembly amended the definition of exempt commercial policies by removing the minimum premium requirement, thus making all commercial insured policies exempt from DOI rate approval. S.C.Code Ann. § 38–1–20(4) (Supp.2008).

The General Assembly's recognition of a class of exempt commercial policies abrogated the DOI's rate-making authority over the policies at issue. Act No. 235 eliminated the subject policies from the public notice requirement by specifically exempting them from the rate-making requirements of Title 38. This exemption eliminated the instant policies from the requirement of public notice given to consumers of a proposed rate increase and the fundamental requirement that "[n]o insurer may make or issue a contract or policy except in accordance with the filings which are in effect for the insurer." *Id.* § 38–73–920.

Furthermore, this Court has recognized that "sellers of exempt commercial policies are not required to file rate schedules and plans with the [DOI]." *Croft v. Old Republic,* 365 S.C. 402, 410, 618 S.E.2d 909, 913 (2005). Finally, the DOI has specifically noted that "no insurer of exempt commercial policies will be required to file any classification, rate, rule, or rating plan." S.C.Code Ann. Regs. § 69–64 (Supp.2008). As argued by Plaintiffs, the DOI continued to require rating agencies to file LC data with the DOI for its approval. However, beginning in 2000 with the advent of exempt commercial policies, the DOI was not vested with the authority to regulate LCM.

The filing at issue was made in 2001, a year after exempt commercial policies were no longer subject to rate setting regulation by the DOI. All of policies at issue were for large commercial insureds and carried premiums in excess of $50,000, thus all were exempt commercial policies under both the original and amended versions of the definition of this term. Therefore, because the submission made by Defendants in 2001 did not invoke the regulatory authority of the

DOI, the Plaintiffs' claim against Defendants is not barred by the Filed Rate Doctrine.

## II. Exceptions to the Filed Rate Doctrine

Plaintiff argues that, if the Filed Rate Doctrine applies in this instance, their claims ought to fall within an exception to the Doctrine. Because the Filed Rate Doctrine does. not apply so as to bar Plaintiffs' claims, we decline to answer the second certified question.

### CONCLUSION

In addressing the issues before us, we make no judgments regarding the merits of Plaintiffs' underlying claims. We answer the questions narrowly, finding that because the workers' compensation policies at issue were exempt commercial policies, Defendants' submissions to the DOI in 2001 did not invoke the regulatory authority of the DOI and the Filed Rate Doctrine does not bar Plaintiffs' claims. Thus, the Court need not address the Federal Court's second certified question.

BEATTY, KITTREDGE, HEARN, JJ., and Acting Justice JAMES E. MOORE, concur.