**N.C. STEEL, INC. v. NATIONAL COUNCIL ON COMPENSATION INS.**

[347 N.C. 627 (1998)]

include a general description of the position's duties, the Personnel Commission's findings focus on the fact that "[t]o . . . volunteers and other citizens across the state, the Director of the Beautification Program was the eyes and ears of the Governor, the Administration and the department with respect to beautification and other related issues." Being "the eyes and ears of the Governor," or of anyone else in state government, does not equate with the statutory test for policymaking so as to warrant exempting this position.

The majority states that "the evidence was capable of two reasonably conflicting views." I agree with the trial court's and the Court of Appeals' conclusion that there is a total lack of substantial evidence to support the State's position in this case. Therefore, I respectfully dissent.

Justice Lake joins in this dissenting opinion.

━━━━━━━━━━

N.C. STEEL, INC.; N.C. STEEL ERECTORS, INC.; N.C. STEEL MANAGEMENT, INC.; N.C. STEEL FABRICATORS, INC.; AIRCRAFT SERVICES OF RALEIGH, INC.; MONTAGUE BUILDING COMPANY; SMITH & SMITH, SURVEYORS, P.A., AND NORTH CAROLINA MARBLE & GRANITE v. NATIONAL COUNCIL ON COMPENSATION INSURANCE; NATIONAL WORKERS' COMPENSATION REINSURANCE POOL; NORTH CAROLINA RATE BUREAU; AETNA CASUALTY & SURETY COMPANY; CIGNA INSURANCE COMPANY AND INS. CO. OF NORTH AMERICA; EMPLOYERS INS. OF WAUSAU A MUTUAL COMPANY; FIDELITY & CASUALTY CO. OF N.Y.; HARTFORD UNDERWRITERS INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; MICHIGAN MUTUAL INSURANCE COMPANY; NATIONAL SURETY CORPORATION; ST. PAUL FIRE & MARINE INSURANCE COMPANY; THE TRAVELERS INSURANCE COMPANY; AND UNITED STATES FIDELITY AND GUARANTY COMPANY

No. 317PA96

(Filed 6 March 1998)

**1. Insurance § 8 (NCI4th)— filed rate doctrine—adoption for North Carolina**

The filed rate doctrine, which provides that a plaintiff may not claim damages on the ground that a rate approved by a regulator as reasonable is nonetheless excessive because it is the product of unlawful conduct, is adopted for application in North Carolina.

**N.C. STEEL, INC. v. NATIONAL COUNCIL ON COMPENSATION INS.**

[347 N.C. 627 (1998)]

2. **Insurance § 8 (NCI4th); Workers' Compensation § 318 (NCI4th)— excessive workers' compensation rates— action against carriers—restraint of trade—unfair practice—unfair competition—claims barred by filed rate doctrine**

The filed rate doctrine barred claims by plaintiff employers against defendant workers' compensation carriers and rate organizations for restraint of trade under N.C.G.S. § 75-1, unfair and deceptive practices under N.C.G.S. § 75-1.1, and unfair competition in violation of N.C.G.S. § 58-63-15 based on allegations that defendants withheld evidence from the Commissioner of Insurance about servicing carrier fees for residual market (assigned risk pool) workers' compensation insurance in a 1992 rate case and caused the Commissioner to approve excessive rates for workers' compensation insurance.

3. **Insurance § 8 (NCI4th)— workers' compensation rates— collateral attack—equitable estoppel cases inapplicable**

Cases which hold that when an insurer makes a representation as to coverage in a filing, it cannot give a lesser coverage in its policies do not apply to an action in which plaintiff employers alleged that defendant insurance carriers and rate organizations withheld information from the Commissioner of Insurance in a rate case and caused the Commissioner to approve excessive rates.

4. **Insurance § 8 (NCI4th); Workers' Compensation § 318 (NCI4th)— workers' compensation rates—illegal activities—injunctive relief—filed rate doctrine**

The filed rate doctrine barred plaintiffs' claims for injunctive relief based on alleged illegal activities in the setting of workers' compensation insurance rates.

5. **Workers' Compensation § 318 (NCI4th)— excessive servicing carrier fees—forcing into residual market—claim for damages—filed rate doctrine**

The filed rate doctrine barred plaintiff employers' claims for damages based on allegations that a conspiracy by defendant workers' compensation carriers and rating organizations to fix excessive servicing carrier fees forced some employers into the residual market (assigned risk pool) where the premiums are higher and the employers do not receive dividends on their poli-

**N.C. STEEL, INC. v. NATIONAL COUNCIL ON COMPENSATION INS.**

[347 N.C. 627 (1998)]

cies since plaintiffs could not prove damages without recalculating rates previously fixed by the Commissioner of Insurance.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 123 N.C. App. 163, 472 S.E.2d 578 (1996), affirming in part and reversing in part an order entered 16 February 1995 by Clark, J., in Superior Court, Wake County, granting the defendants' motion for summary judgment. Heard in the Supreme Court 18 March 1997.

This is an action by eight corporations which allege that the eleven defendant insurance companies and three other entities have engaged in a restraint of trade in violation of N.C.G.S. § 75-1; have engaged in unfair and deceptive practices in violation of N.C.G.S. § 75-1.1; have engaged in unfair competition in violation of N.C.G.S. § 58-63-15; have engaged in constructive fraud; have breached a fiduciary duty; have breached a covenant of good faith and fair dealing; and have conspired to commit fraud, breach of fiduciary duty, and breach of implied covenants of good faith and fair dealing. The only claims brought forth with this appeal are the claims based on chapters 58 and 75 of the North Carolina General Statutes.

The defendants moved to dismiss the action pursuant to N.C.G.S. § 1A-1, Rule 12(b)(1) and (c). At the hearing on this motion, the court considered matters outside the pleadings, which converted it to a hearing for summary judgment. *Stanback v. Stanback*, 297 N.C. 181, 205, 254 S.E.2d 611, 627 (1979). The superior court granted the motion for summary judgment, and the Court of Appeals affirmed in part and reversed in part. We allowed petitions for discretionary review by plaintiffs and defendants.

*Lore & McClearen, by R. James Lore, for plaintiff-appellants and -appellees.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by James D. Blount, Jr., and Steptoe & Johnson, by Mark F. Horning, for The Aetna Cas. & Surety Co.; Womble, Carlyle, Sandridge & Rice, by Pressly M. Millen, for National Council on Compensation Insurance and National Workers' Compensation Reinsurance Pool; Young, Moore, Henderson & Alvis, by R. Michael Strickland, for N.C. Rate Bureau; Poyner & Spruill, by John R. Jolly, Jr., for CIGNA Ins. Co. and Ins. Co. of North America; Ragsdale, Liggett & Foley, by George R. Ragsdale, for Employers Ins. of Wausau; Cranfill, Sumner &*

**N.C. STEEL, INC. v. NATIONAL COUNCIL ON COMPENSATION INS.**

[347 N.C. 627 (1998)]

*Hartzog, by Dan M. Hartzog, for Fidelity & Cas. Co. of New York; Moore & Van Allen, by Joseph W. Eason and Denise Smith Cline, for Hartford Underwriters Ins. Co.; Manning, Fulton & Skinner, by John B. McMillan, for Liberty Mutual Ins. Co.; Moore & Van Allen, by Joseph W. Eason and Denise Smith Cline, for Michigan Mutual Ins. Co.; Maupin, Taylor, Ellis & Adams, by M. Keith Kapp, for National Surety Corp.; Petree Stockton, L.L.P., by John L. Sarratt, for St. Paul Fire & Marine Ins. Co.; Parker, Poe, Adams & Bernstein, by John F. Graybeal, for Travelers Ins. Co.; and Tharrington, Smith & Hargrove, by Douglas E. Kingsbery, for United States Fidelity & Guaranty Co., defendant-appellants and -appellees.*

*The Alliance of American Insurers, by Ann W. Spragens, Senior Vice President and General Counsel, amicus curiae.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by B. Davis Horne, Jr., on behalf of American Insurance Association and National Association of Independent Insurers, amici curiae.*

WEBB, Justice.

The gravamen of the plaintiffs' claim is that the defendants withheld certain evidence from the Insurance Commissioner in a rate case decided in 1992, causing the Commissioner to approve excessive rates for workers' compensation insurance. The materials submitted at the hearing on the motion for summary judgment showed that workers' compensation insurance, with minor exceptions, is mandatory. N.C.G.S. § 97-9 (1991). Employers may be self-insured, they may purchase insurance in the voluntary market, or they may purchase insurance in the residual market. Employers who are not or cannot be self-insured and who cannot purchase insurance in the voluntary market must purchase in the residual market, often called the assigned risk pool. N.C.G.S. § 58-36-1(5) (1994). There is a 14% surcharge for coverage in the residual market, and dividends are not paid on residual market coverages as is done in the voluntary market.

Workers' compensation rates are regulated by law. The process of rate-making is begun by the filing of proposed rates with the Insurance Commissioner by the North Carolina Rate Bureau (NCRB). N.C.G.S. § 58-36-15 (1994). The proposed rates become legal rates unless the Insurance Commissioner intervenes and holds hearings for

the purpose of approving final rates. N.C.G.S. § 58-36-20 (1994). The NCRB is an organization created by statute, N.C.G.S. § 58-36-1, and is a defendant in this case. Much of NCRB's function in rate increase applications is done by a national rating organization, the National Council on Compensation Insurance (NCCI), which is also a defendant in this case.

The plaintiffs contend that the way the residual market is conducted by the defendants unlawfully causes excessive rates. The Commissioner of Insurance has promulgated a "North Carolina Workers' Compensation Insurance Plan" (Plan), which delegates the regulation of the residual market to NCRB. The plan requires that each company writing workers' compensation insurance accept customers assigned to it who have not been able otherwise to procure such coverage.

NCCI has created a National Workers' Compensation Pool (Pool) consisting of all insurance companies who write workers' compensation insurance in North Carolina. The Pool is a defendant in this case. Premiums paid for assigned risk insurance are deposited in the Pool. When an insured is accepted for assigned risk insurance, a member of the Pool is designated to service its policy. This company, which is called a servicing carrier, issues a policy and services it. It does not keep the premium, however. The premiums are deposited in the Pool, and claims are paid from the Pool. In this way, all carriers of assigned risk insurance share equally in the assigned risk losses.

The companies which issue assigned risk policies are paid servicing carrier fees by the Pool. These fees are agreed upon by the Pool and the carriers, and varied from 27.4% to 30% of assigned risk premiums during the period from 1989 through 1993. It is the servicing carrier fees about which the plaintiffs complain.

The plaintiffs assert two theories of damages resulting from the alleged illegal activity. First, they contend rates are forced up by the use of the servicing carrier fees, which are undisclosed noncompetitive expenses, and loss factors that would have been demonstrably lower in a competitive residual market, thereby adversely affecting purchasers of workers' compensation insurance in both the voluntary and residual markets. Second, they say that the actions of the defendants forced some policyholders into the residual market, where the premiums are higher and the plaintiffs do not receive dividends on their policies.

**N.C. STEEL, INC. v. NATIONAL COUNCIL ON COMPENSATION INS.**

[347 N.C. 627 (1998)]

**[1]** The defendants rely on the filed rate doctrine, which grew from the United States Supreme Court's opinion in *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 67 L. Ed. 183 (1922). The filed rate doctrine provides that a plaintiff may not claim damages on the ground that a rate approved by a regulator as reasonable is nonetheless excessive because it is the product of unlawful conduct. *See also Square D Co. v. Niagra Frontier Tariff Bur*eau, 476 U.S. 409, 90 L. Ed. 2d 413 (1986).

We agree with the Court of Appeals for the reasons stated in its opinion that we should adopt the filed rate doctrine. The General Assembly has given the Insurance Commissioner the duty of setting rates. The Commissioner, aided by his staff, has the expertise to determine proper rates. We do not believe that, by the enactment of N.C.G.S. ch. 75, the General Assembly intended that duly set rates be challenged in another forum. When the Commissioner approved the rates, they became the proper rates.

As Judge Wynn, writing for the Court of Appeals, points out, chapter 58 of the General Statutes contains a comprehensive regulatory scheme for insurance companies, which includes provisions for punishing violators of the chapter. N.C.G.S. § 58-2-70(g) (1994). It also contains a provision for the appeal of decisions of the Commissioner. N.C.G.S. § 58-2-75(a) (1994). We do not believe that, with this comprehensive regulatory scheme, the General Assembly intended that the rates could be collaterally attacked.

**[2]** The plaintiffs contend that the servicing carrier fees were not considered by the Commissioner. They say that the failure of the defendants to disclose to the Commissioner the plan by which these fees are paid is a violation of N.C.G.S. § 58-63-15(5) and an unfair practice. We believe this is a good example of why questions involving rates should be settled by the Insurance Commissioner and not by a jury. Whether the payment of the servicing carrier fees is a relevant factor which must be considered by the Commissioner in setting rates pursuant to N.C.G.S. § 58-36-10 is a technical question which requires considerable expertise to answer. It is best decided by the Commissioner, who has this expertise. It should not be decided by a court or jury, which does not have this expertise.

The plaintiffs rely on several cases which they say establish the rule that actions for violations of chapter 58 may be brought under N.C.G.S. §§ 75-1 and 75-1.1. *Pearce v. American Defender Life Ins. Co.*, 316 N.C. 461, 343 S.E.2d 174 (1986); *Dull v. Mutual of Omaha*

*Ins. Co.*, 85 N.C. App. 310, 354 S.E.2d 752, *disc. rev. denied*, 320 N.C. 512, 358 S.E.2d 518 (1987); *Phillips v. Integon Corp.*, 70 N.C. App. 440, 319 S.E.2d 673 (1984); *Ellis v. Smith-Broadhurst, Inc.*, 48 N.C. App. 180, 268 S.E.2d 271 (1980). These cases involve wrongs which are not involved with rate-making. The filed rate doctrine provides that rates may not be collaterally attacked after they have been set by a regulator. These cases are not precedent for this case.

The plaintiffs next argue that applying the filed rate doctrine in this case is inconsistent with *State ex rel. Hunt v. N.C. Reinsurance Facility*, 302 N.C. 274, 275 S.E.2d 399 (1981). We held in that case that recoupment surcharges which insurers were allowed to assess their policyholders were not rates which had to be filed with the Insurance Department. The defendants argue that, in the same way, the servicing carrier fees involved in this case are not subject to regulation by the Commissioner, and the filed rate doctrine should not bar them from pursuing a remedy based on a price fixing conspiracy in regard to the servicing carrier fees.

The plaintiffs are complaining about the rates set by the Commissioner. This distinguishes the case from *Hunt*. It is the approval of the rates by the Commissioner that gives them the protection of the filed rate doctrine.

The plaintiffs next contend that the General Assembly, by an amendment to N.C.G.S. § 58-63-15, showed that it intended that actions such as this one may be maintained. N.C.G.S. § 58-63-15 lists thirteen things that are unfair methods of competition or unfair or deceptive practices. In 1986, the General Assembly amended the section to provide that a violation of one of the thirteen unfair practices does not create a private cause of action. The other twelve unfair practices were not mentioned in the revision of the section, and the plaintiffs argue that this means private causes of action may be brought on violations of any of them. None of the wrongs enumerated in N.C.G.S. § 58-63-15 involved the wrongs alleged in this case. We do not believe the General Assembly had wrongs of this type in mind when it amended the section.

The plaintiffs next argue that *Keogh* is distinguishable from this case because in *Keogh* the United States Supreme Court recognized that the plaintiffs had a remedy under the Interstate Commerce Act. They did not need a second remedy under the Sherman Antitrust Act. We do not believe an adequate other remedy is necessary for the

application of the filed rate doctrine. We note, however, that after the determination of a rate, a ratepayer may petition the Commissioner to investigate for fraud. N.C.G.S. § 58-2-70(c). If the Commissioner determines there was fraud in the application, he may petition the Superior Court, Wake County, for an order for restitution to any injured party. N.C.G.S. § 58-2-70(e). This is a remedy for injured ratepayers.

The plaintiffs next contend that certain language in *ICC v. Transcon Lines*, 513 U.S. 138, 130 L. Ed. 2d 562 (1995), provides that when there is a comprehensive regulatory scheme with which a party must comply, there may be a departure from the filed rate in order to comply with the whole scheme. The plaintiffs say we have a comprehensive regulatory scheme in this case, which includes chapter 75 of the General Statutes. *Transcon* deals with the authority of the Interstate Commerce Commission to obtain injunctive relief to enforce regulations adopted by the Commission. It does not deal with the issues involved in this case.

The plaintiffs next rely on N.C.G.S. § 58-63-35(d), which provides:

No order of the Commissioner under this Article or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this State.

N.C.G.S. § 58-63-35(d) (1994). The plaintiffs say that this section makes other available remedies a part of the comprehensive insurance regulation of the State. They rely on *Stanley v. Moore*, 339 N.C. 717, 454 S.E.2d 225 (1995), for the proposition that a remedy under one statute does not preclude a remedy under another statute. In *Stanley*, we held that a plaintiff could bring an action for treble damage pursuant to N.C.G.S. ch. 75-1, art. 1, for a violation of the Ejectment of Residential Tenants Act although there was a remedy under the Act. There was a provision in the Tenants Act which provided, "[t]he remedies created by this section are supplementary to all existing common-law and statutory rights and remedies." N.C.G.S. § 42-25.9(c) (1994).

*Stanley* is distinguishable from this case. There was no setting of a rate in *Stanley*. We believe that N.C.G.S. § 58-63-35 provides that a person is not relieved of other liability by this section if he is otherwise liable. In this case, the defendants are not otherwise liable because of the filed rate doctrine.

The plaintiffs, relying on *United States v. Radio Corp. of America*, 358 U.S. 334, 3 L. Ed. 2d 354 (1959), argue that the regulatory power of the Commissioner of Insurance is not complete, and this allows an action under chapter 75. The regulatory power of the Commissioner is complete so far as setting rates is concerned. That is all that is involved in this case.

The plaintiffs next contend that we should adopt the state action doctrine as articulated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 119 L. Ed. 2d 410 (1992). Under the state action doctrine antitrust actions are immune from prosecution if (1) the state's intent is to replace competition with state regulation, and (2) the state in fact actively supervises the challenged conduct. The plaintiffs contend that the second prong of the state action doctrine is not met in this case because there is no state supervision of the servicing carrier fees. The plaintiffs argue that the state action doctrine subsumes the filed rate doctrine and includes more than rate issues. They say that we used the state action doctrine in *Madison Cablevision, Inc. v. City of Morganton*, 325 N.C. 634, 656, 386 S.E.2d 200, 213 (1989).

In *Madison Cablevision*, we said that it was not necessary to the decision in that case, but we discussed the state action doctrine to demonstrate it was consistent with the result we reached. We do not believe we should adopt the state action doctrine in this case. We might adopt the state action doctrine in a proper case, but in a case dealing with insurance rates, we believe the reasoning of *Keogh* is sound.

[3] The plaintiffs next contend that the doctrine of equitable estoppel in insurance regulation as adopted in other states should be adopted in this state. They cite three cases to support this proposition. *Continental Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937 (E.D. Pa. 1995); *Anderson v. Minnesota Ins. Guar. Ass'n*, 520 N.W.2d 155 (Minn. Ct. App. 1994), *rev'd on other grounds*, 534 N.W.2d 706 (Minn. 1995); *Morton Int'l, Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied*, 512 U.S. 1245, 129 L. Ed. 2d 878 (1994). These three cases hold that when an insurer makes a representation as to coverage in a filing, it cannot give a lesser coverage in its policies. These cases have no application to this case. They do not involve the setting of insurance rates.

[4] Finally, the plaintiffs say the Court of Appeals was in error in saying they had abandoned their claim for injunctive relief. They contend that the filed rate doctrine does not bar a claim for in-

junctive relief. They rely on a sentence in *Square D*, 476 U.S. at 422, 90 L. Ed. 2d at 425, which reads, "The alleged collective activities of the defendants . . . were subject to scrutiny under the antitrust laws by the Government and to possible criminal sanctions or equitable relief." They also rely on a sentence in *Keogh*, 260 U.S. at 161, 67 L. Ed. at 187, which reads, "[U]nder the Anti-trust Act a combination of carriers to fix reasonable and nondiscriminatory rates may be illegal, and if so, the government may have redress by criminal proceedings . . . [or] by injunction." We are not bound by the United States Supreme Court's ruling as to equitable relief. Nevertheless, we believe the two sentences relied upon by the plaintiffs say it is the government, and not individuals, that is entitled to equitable relief.

We affirm the Court of Appeals in its holding that the plaintiffs do not have a claim based on illegal activities in the setting of workers' compensation insurance rates.

[5] The plaintiffs also contend that they may recover on what they say is a "non-rate" theory, which they describe as follows: The plaintiffs say the defendants conspired to pay excessive servicing carrier fees, which prevented the premiums from covering losses in the residual market. Because of this shortfall, the defendants had to use part of the premiums from the voluntary market to cover this loss. As a result, the defendants placed more marginal risks in the residual market with its higher premiums. The plaintiffs say that it is not necessary to question the rates set by the Insurance Commissioner in order to prove their damages. The damage, say the plaintiffs, comes from the shifting of policyholders into the residual market. The damages they seek do not depend on a challenge to the rates. We disagree.

We believe that the plaintiffs cannot prove their claim without the rates set by the Commissioner being questioned. The plaintiffs' damages must come from being shifted from the voluntary market to the residual market. If the plaintiffs offer evidence that a certain number of policyholders who were in the residual market should have been in the voluntary market, the defendants could show that the influx of these policyholders would have caused the Commissioner to set different rates for the two markets. This is a questioning of rates set by the Commissioner, which the filed rate doctrine is designed to prevent.

The plaintiffs rely on the affidavit of Dr. John W. Wilson, an expert in insurance rates, who stated that "none of the damages

deriving from this forced expansion of the residual market as a result of excessive servicing carrier fees depend on or result in changes in the regulated manual rates." Dr. Wilson's statement, however, is not supported by the record. We can find no other way to calculate the damages plaintiffs allege than to require a jury to speculate regarding what rate the Commissioner would have approved had the allegedly excessive fee been considered, and had more employers been able to purchase insurance in the voluntary market.

This case is analogous to *Uniforce Temporary Personnel, Inc. v. National Council on Compensation Insurers, Inc.*, 892 F. Supp. 1503 (S.D. Fla. 1995), *aff'd*, 87 F.3d 1296 (11th Cir. 1996), which involved a claim that the ratepayers were improperly insured in the residual market and thus forced to pay higher rates than they would have if they had obtained insurance in the voluntary market. In *Uniforce*, employers claimed that the defendant-insurance carriers conspired to fix excessively high servicing carrier fees, which resulted in the employers' being forced to purchase insurance in the residual market instead of the voluntary market. *Id.* at 1507. The court in that case determined that the "plaintiffs' claims for damages [fell] squarely within the filed rate doctrine." *Id.* at 1512. As in *Uniforce*, the jury in this case would have had

to measure the difference between the properly approved workers' compensation insurance rates paid by plaintiffs and those mythical rates which would have been applicable but for the defendants' concerted activity. This undertaking is not within the province of the courts but should reside with the respective state regulators with authority over rate-setting.

*Id.* The plaintiffs' second theory of recovery thus cannot survive a motion for summary judgment and is barred by the filed rate doctrine.

The Court of Appeals held that it is not necessary to question the rates set by the Commissioner under the plaintiffs' second claim. It said it was not necessary to calculate approved rates in order to determine damages, and relief could be given to the plaintiffs by determining the number of insurers who were forced to purchase in the residual market. This is where we differ with the Court of Appeals. We do not believe the plaintiffs could prove damages without recalculating rates previously approved by the Insurance Commissioner.

We reverse the Court of Appeals on the plaintiffs' second claim for relief.

AFFIRMED IN PART AND REVERSED IN PART.