Novo Nordisk Pharm. Indus., Inc. v. Carolina Power & Light Co., 2008 NCBC 16

STATE OF NORTH CAROLINA

COUNTY OF JOHNSTON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 154

NOVO NORDISK PHARMACEUTICAL
INDUSTRIES, INC.,
    Plaintiff

   v.

CAROLINA POWER & LIGHT COMPANY
d/b/a PROGRESS ENERGY CAROLINAS,
INC. and GREGORY POOLE EQUIPMENT
COMPANY,
    Defendants

and

CAROLINA POWER & LIGHT COMPANY
d/b/a PROGRESS ENERGY CAROLINA,
INC.,
    Third-Party Plaintiff

   v.

AAA ELECTRICAL COMPANY, INC. and
SQUARE D COMPANY,
    Third-Party
    Defendants

and

SQUARE D COMPANY,
    Additional
    Third-Party
    Plaintiff

   v.

CATERPILLAR, INC.,
    Additional
    Third-Party
    Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER AND OPINION ON
CROSS MOTIONS
FOR SUMMARY JUDGMENT**

THIS CAUSE came before the court for hearing upon respective cross motions for summary judgment by Plaintiff Novo Nordisk Pharmaceutical Industries, Inc. ("Novo"), Defendant Carolina Power & Light Company, d/b/a Progress Energy Carolinas, Inc. ("CP&L") and Defendant Gregory Poole Equipment Company ("GPEC").

*Cozen O'Connor, LLP by Peter F. Asmer, Jr., Esq. for Plaintiff.*

*Nelson, Mullins, Riley & Scarborough, LLP by Robert A. Meynardie, Esq. and Leslie Lane Mize, Esq. for Defendant/Third-Party Plaintiff Carolina Power and Light Company d/b/a Progress Energy Carolinas, Inc.*

*McAngus, Goudelock & Courie, LLC by Scott A. Scurfield, Esq. for Defendant Gregory Poole Equipment Company.*

*Donald E. Clark, Jr., Esq., Attorney at Law, PLLC for Third-Party Defendant AAA Electrical Company, Inc.*

*Young Moore & Henderson, PA by Walter E. Brock, Jr., Esq. for Third-Party Defendant/Additional Third-Party Plaintiff Square D Company.*

*Millberg, Gordon & Stewart, PLLC by John C. Millberg, Esq. and Gordon, Hargrove & James, PA by Gordon James, III, Esq. for Additional Third-Party Defendant Caterpillar, Inc.*

Jolly, Judge.

Among other things, the motions before the court present the issue of whether and to what extent a public utility contractually may limit its liability for subsequent acts pursuant to the filed rate doctrine, as adopted by the North Carolina Supreme Court in *N.C. Steel, Inc. v. National Council on Comp. Ins.*, 347 N.C. 627, 632, 496 S.E.2d 369, 372 (1998).

THE COURT, after considering the briefs, arguments of counsel, affidavits on file and appropriate matters of record, reaches the CONCLUSIONS reflected in this Order.

## I.

## PROCEDURAL BACKGROUND

[1]  Plaintiff Novo filed its Complaint on January 13, 2005.

[2]  Defendant GPEC filed its Answer to the Complaint, raising various affirmative defenses, on March 24, 2005.

[3]  GPEC and Defendant CP&L filed motions to dismiss the Complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") on January 3, 2006, and January 19, 2006, respectively.

[4]  On February 10, 2006, the Honorable William C. Gore, Jr. denied GPEC's and CP&L's Rule 12 motions.

[5]  Subsequently, CP&L pled in third-party defendants, and CP&L and GPEC cross-claimed against each other.

[6]  Defendant CP&L filed its Amended Answer, raising various affirmative defenses, on December 13, 2006.

[7]  On January 19, 2007, this matter was designated an exceptional case and was assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts.

[8]  On March 9, 2007, the Parties filed a Consent Motion to Stay Discovery, which requested that the court stay all discovery in this matter until such time as Novo, CP&L and GPEC filed, and the court ruled upon, motions for summary judgment on the issue of whether language in the contracts between Novo and CP&L acts as a waiver or liability limitation as to certain claims propounded in the Complaint.

[9]  On March 14, 2007, the court entered an Order Staying Discovery and Scheduling Briefing regarding such issue.

[10]  Pursuant to such briefing schedule, on March 30, 2007, (a) CP&L filed its Motion for Summary Judgment; (b) GPEC filed its Motion for Summary Judgment; (c) Novo filed its Motion for Partial Summary Judgment Against CP&L; and (d) Novo filed its Motion for Partial Summary Judgment Against GPEC (collectively, the "Cross Motions").

[11]  The court heard oral argument on the Cross Motions on August 14, 2007.

## II.

## THE PARTIES

[12]   Novo is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in North Carolina.

[13]   CP&L is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business located in Wake County, North Carolina.  CP&L operates and acts as a public utility.

[14]   GPEC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wake County, North Carolina.

[15]   AAA Electrical Company, Incorporated; Square D Company; and Caterpillar, Incorporated, are not parties to the Cross Motions addressed herein.

## III.

## FACTUAL BACKGROUND

The court CONCLUDES that the following material facts exist without substantial controversy and are pertinent to the issues raised by the Cross Motions:

[16]   Novo owns and operates a pharmaceutical manufacturing facility located in Clayton, North Carolina, at which it produces insulin (the "Facility").

[17]   The Facility requires an uninterrupted power supply.

[18]   On January 16, 1992, Novo entered a contract with CP&L for the provision of electricity at the Facility.  At all times relevant hereto, Novo received its electric power from CP&L.

[19]   In 2001, following a number of power outages, Novo and CP&L entered a number of agreements aimed at supplying the Facility with permanent backup power generation that would protect against electrical outages and power fluctuations.

[20]   On or about September 17, 2001, Novo and CP&L entered into a Premier Power Services Contract and a Rider PPS-3 to the Premier Power Services Contract (collectively, the "Temporary PPS Contract").

[21]   Among other things, the Temporary PPS Contract provided that CP&L would install and maintain two temporary generators that would supply all of the Facility's electrical needs (the "Temporary Generators") while a more permanent backup system was being put into place.

[22]  Thereafter, the Temporary PPS Contract was approved by the North Carolina Utilities Commission (the "Commission").

[23]  On or about October 17, 2001, Novo and CP&L entered into another Premier Power Service Contract and a Rider PPS-3, which was subsequently succeeded by Rider PPS-5 (collectively the "Permanent PPS Contract").

[24]  Among other things, the Permanent PPS Contract provided that CP&L would install a permanent backup generation system at the Facility (the "Permanent Solution"), that included two on-site generators (the "Backup Generators") and the switchgear necessary to automatically switch the electrical load between the utility and the Backup Generators (the "Switchgear"), when necessary.

[25]  Thereafter the Permanent PPS Contract was approved by the Commission.

[26]  Also on or about October 17, 2001, Novo and CP&L entered into a Managed Services Contract (the "MSC").

[27]  Among other things, the MSC provided that CP&L would supply a short-term uninterruptible power supply ("UPS") at the Facility to provide power while the Backup Generators contemplated in the Permanent PPS Contract came on line.

[28]  The MSC was not presented to the Commission for approval.

[29]  As a subcontractor to CP&L, GPEC installed and supplied various equipment required by Novo and CP&L's contracts. In this regard, GPEC supplied (a) the Temporary Generators contemplated under the Temporary PPS Contract, (b) the Backup Generators and Switchgear contemplated under the Permanent PPS Contract, and (c) the UPS contemplated under the MSC.

[30]  On January 16, 2002, power at the Facility was interrupted (the "January Outage").  At this time, all electric service at the Facility was provided by the Temporary Generators.

[31]  The January Outage occurred when a wire to an alternator in one of the Temporary Generators separated, causing both Temporary Generators to trip off line.

[32]  In March 2002, with the Permanent Solution in place but not fully tested, and the UPS also in place, the Facility was switched back to CP&L's utility feed as its primary source of power.

[33]   On or about March 30, 2002, two power outages occurred at the Facility (the "March Outages").

[34]   The March Outages occurred when a loose buss bar in the UPS caused an electrical short.

[35]   On July 23, 2002, a power outage occurred at the Facility (the "July Outage").

[36]   The July Outage occurred when equipment and/or software related to the Switchgear caused the failure of one of the Backup Generators.

IV.

THE PARTIES' CONTENTIONS

[37]   Novo claims that the January Outage, March Outages, and July Outage caused it damages in lost property and production, and that CP&L and/or GPEC are liable for such damages in contract or tort.

[38]   Without contesting fault for the outages, CP&L argues that it cannot be liable for any damages suffered due to the power outages at the facility because:

   a.   The January Outage is governed by the Temporary PPS Contract -- a filed rate shielded from collateral attack, and inherently reasonable, per its approval by the Commission -- which contains limiting language that effectively precludes any liability CP&L may have for the January Outage.

   b.   The March Outages are governed by the MSC -- a contract for services outside of CP&L's public utility business -- which contains language that limits any liability CP&L may have for the March Outages.

   c.   The July Outage is governed by the Permanent PPS Contract -- a filed rate shielded from collateral attack, and inherently reasonable, per its approval by the Commission -- which contains limiting language that effectively precludes any liability CP&L may have for the July Outage.

[39]   CP&L contends that pursuant to such arguments it is entitled to judgment as a matter of law as to certain claims stated in Novo's Complaint, namely Count I (breach of the Permanent PPS Contract) and Count III (breach of an express warranty created by the Permanent PPS Contract); and entitled to partial judgment as a matter of law as to Count II (breach of the Managed Services Contract) and Count IV (negligence by CP&L).

[40] Without contesting its fault, GPEC contends that, as a subcontractor of CP&L, the liability limitations also apply to it; and that pursuant to such liability limitations it is entitled to judgment as a matter of law as to Count V of Novo's Complaint (negligence by GPEC).[1]

[41] Novo argues that the contractual liability limitations are ineffective as against their claims because:

    a. The filed rate doctrine does not preclude the authority of the court to rule upon the enforceability of the liability limitations of the Temporary PPS Contract and the Permanent PPS Contract.

    b. CP&L's status as a public utility, and its unequal bargaining power, render the liability limitations, which are so broad as to be exculpation clauses, void as a matter of law or public policy.

    c. The proper interpretation of the Temporary PPS Contract and Permanent PPS Contract is that CP&L has not limited its liability for actions of its subcontractors.

    d. The proper interpretation of the MSC is that CP&L has not limited liability either for any direct damages it caused, or for any damages caused by its subcontractors.

[42] Novo contends that pursuant to such arguments, it is entitled to judgment as a matter of law as to CP&L's Second (filed rate doctrine); Sixth (laches, waiver, and estoppel); and Eighth (contractual liability limitations) Affirmative Defenses; and GPEC's Second (laches, waiver, and estoppel) and Fourth (contractual liability limitations) Affirmative Defenses; and that CP&L's and GPEC's Motions for Summary Judgment should be denied.

V.

THE CONTRACTS

[43] The Temporary PPS Contract and the Permanent PPS Contract each provide, among other things, that:

---

[1] Novo's only other claim against GPEC was Count VI (third party beneficiary breach of contract) of the Complaint, which Novo has voluntarily dismissed (Mar. 9, 2007 Notice of Voluntary Dismissal Without Prejudice as to Count VI Only).

[Both the Temporary and Permanent PPS Contracts are] an addendum to the Service Agreement executed between the parties for the supply of electricity on January 16, 1992, which shall be modified as set forth herein.

. . .

LIMITATION OF LIABILITY:  Neither [CP&L] nor its employees, its subcontractors, or suppliers shall be liable for any direct, indirect, general, special, incidental, exemplary, or consequential loss or damage of any nature arising out of their performance or non-performance hereunder. This provision shall apply whether such liability arises in contract, tort (including negligence), strict liability, or otherwise.

. . .

USE OF SUBCONTRACTORS:  [CP&L] shall be permitted to use subcontractors to perform the services.  Notwithstanding the use of subcontractors, [CP&L] shall continue to be responsible for the quality of the services.

. . .

WARRANTY:  [CP&L] warrants that services shall be performed in accordance with generally accepted industry practices.  The Warranty set forth above is exclusive, and no other warranty or remedy of any kind, whether statutory, written, oral, express, or implied, including without limitation warranties of merchantability and fitness for a particular purpose, or warranties arising from course of dealing or usage of trade shall apply. Except as provided in the Use of Subcontractors provision above, [CP&L] shall not be responsible for any work done by others or for any loss, damage, cost, or expense arising out of or resulting from such work, unless authorized in advance by [CP&L].

[44]  The MSC provides, among other things, that:

CP&L shall design, install, operate, monitor and maintain the power protection solutions, equipment, facilities and related services for the contract term . . . .

. . .

Warranty Disclaimer. . . .  CP&L MAKES NO WARRANTY EITHER EXPRESS OR IMPLIED WITH REGARD TO THE ASSETS.  CP&L HEREBY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.  [NOVO] UNDERSTANDS AND AGREES THAT ITS EXCLUSIVE REMEDIES FOR ANY FALURE OF THE ASSETS (WHETHER OR NOT DUE TO OR RESULTING FROM CP&L'S

NEGLIGENCE, WILLFUL MISCONDUCT, OR BREACH OF ITS OBLIGATIONS HEREUNDER) SHALL BE: A) THE PROMPT AND DILIGENT EFFORTS OF CP&L TO RESTORE THE EQUIPMENT TO OPERATION; AND B) MONETARY DAMAGES NOT TO EXCEED THE LIMITATIONS SET FORTH IN [THE LIMITATION OF LIABILITY SECTION].  ANY COMPENSATION OR RECOURSE OFFERED BY OR AVAILABLE AGAINST THE EQUIPMENT MANUFACTURER IN THE EVENT OF EQUIPMENT FAILURE SHALL BE PAID OR ASSIGNED DIRECTLY TO [NOVO].

. . .

Limitation of Liability.  Except to the extent stated immediately below, CP&L shall not be liable to [Novo] for any loss of use, loss of production, or any indirect, special, incidental, exemplary, punitive, multiple or consequential loss or damage of any nature arising out of the negligence or performance or nonperformance by CP&L.  In no event shall CP&L's liability arising out of or in connection with the performance or nonperformance of the Managed Services exceed the total of monthly payments made by [Novo].  The provisions of this Section [] shall apply whether such liability arises in contract, tort (including negligence), strict liability or otherwise.

. . .

Subcontracting and Assignment. . . .  It is understood and agreed that, while the obligations of CP&L under this Contract may be primarily performed by subcontractors, CP&L remains responsible for the activities of its assignees and subcontractors to the extent such activities are directly related to the performance of CP&L's obligations under this Contract.

## VI.

## RELEVANT LAW

[45]   North Carolina has adopted the filed rate doctrine, which provides that a plaintiff may not challenge a Commission-approved filed rate, including attendant contractual provisions, unless that challenge is made while the proposed rate is before the Utilities Commission for approval.  Once a rate contract is approved by the Commission as being reasonable, a plaintiff may not later collaterally attack the rate contract in a court of law, even if the rate itself is the product of unlawful conduct.  *N.C. Steel, Inc. v. National Council on Comp. Ins.*, 347 N.C. 627, 632, 496 S.E.2d 369, 372 (1998) (applying the filed rate doctrine in the context of a suit brought under Section 75-1 of the North Carolina General Statutes) (citing *Keogh v. Chicago & N.W. Ry. Co.*, 260

U.S. 156 (1922) (applying the filed rate doctrine to prevent a claim that a rate approved by a ratemaking authority was the product of an antitrust violation), and *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409 (1986)).  The filed rate doctrine bars any later claim that could result in the recalculation of approved rates.  *Id.* at 637, 496 S.E.2d at 375; *see Lupton v. Blue Cross and Blue Shield of N.C.*, 1999 NCBC 4, ¶ 8 (N.C. Super. Ct. June 14, 1999), http://www.ncbusinesscourt.net/opinions/1999%20NCBC%204.htm (interpreting *N.C. Steel*).

[46]    The filed rate doctrine applies to rates approved by a regulatory body that the General Assembly has charged with setting such rates, pursuant to a comprehensive regulatory scheme.  *N.C. Steel,* 347 N.C. at 632, 496 S.E.2d at 372 (relying on the reasoning applied by the Court of Appeals in the decision under review, 123 N.C. App. 163, 472 S.E.2d 578 (1996)).

[47]    The General Assembly of North Carolina has charged the Commission with setting the rates for public utilities, pursuant to a comprehensive regulatory scheme. N.C. Gen. Stat. § 62-130.

[48]    Rates approved by the Commission are analyzed and interpreted in accord with the rules of contractual interpretation.  *State ex. rel. Utils. Comm'n v. Thrifty Call, Inc.*, 154 N.C. App. 58, 63, 571 S.E.2d 622, 626 (2002).

[49]    If the language of a contract "is clear and only one reasonable interpretation exists, the courts must enforce the contract as written" and cannot, under the guise of interpretation, "rewrite the contract or impose [terms] on the parties not bargained for and found" within the contract.  *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978).

[50]    The issue of to what extent a public utility may limit its liability does not appear to have been considered by the North Carolina appellate courts since the decision in *N.C. Steel* formally adopting the filed rate doctrine.  However, in a number of cases preceding adoption of the filed rate doctrine, the North Carolina courts have considered the issue of to what extent a public utility could limit, or exclude, its liability.  They are instructive.  *See, e.g., Gibbs v. Carolina Light & Power Co.*, 265 N.C. 459, 144 S.E.2d 393 (1965) (providing that, while the public interest precludes a public utility from

contracting against its negligence in the regular course of its business, exculpatory clauses, although not favored, are permissible when the contract is not related to the public service; and in determining the force and effect of such clauses, the circumstances surrounding the inclusion of such a clause in the parties' agreement should be considered); *Hall v. Sinclair Refining Co.*, 242 N.C. 707, 89 S.E.2d 396 (1955) (providing that public policy seriously limits the extent to which a public utility can contract against its negligence in performing one of its duties of public service, but that such limitations should be considered in light of the parties' relative bargaining powers); *Russ v. Western Union Telegraph Co.*, 222 N.C. 504, 23 S.E.2d 681 (1943) (holding that a liability limitation contained in a tariff is a part of the rate itself, unable to be modified or changed by the parties, and that the liability limitation at issue precluded the plaintiff's claim).

VII.

CONCLUSION AS TO CP&L

[51]    CP&L contends that in the context of this civil action the unambiguous terms and conditions of both the Temporary PPS Contract and the Permanent PPS Contract, including the Limitation of Liability language included in each, are deemed reasonable and are unassailable pursuant to the filed rate doctrine.  Therefore, it argues, as a matter of law it has no liability to Novo under either Count I or Count III of the Complaint. The court is forced to agree.

[52]    The Temporary PPS Contract and the Permanent PPS Contract, which govern the January and July outages, are filed rates.  As such, the Temporary PPS Contract and Permanent PPS Contract are shielded from collateral attack and considered inherently reasonably, per their approval by the Commission.  Because these contracts contain the Limitation of Liability section, the language of which is unambiguous, the contracts are unassailable and enforceable pursuant to the filed rate doctrine.  While the strength of such argument potentially is undercut by the fact that the Warranty section (which, taken alone, suggests an express warranty of work performed "in accordance with generally accepted industry standards") or the Use of Subcontractors section (which, taken alone, suggests that CP&L warrants the quality of its subcontractor's work) is also a part of the rate approved by the Commission, the express limitation of

liability language of the Temporary PPS and Permanent PPS, taken as a whole, is unambiguous and therefore shielded from attack by way of this lawsuit.[2]

[53] The court recognizes that there are potential public policy concerns inherently involved in the issues raised by the Cross Motions. CP&L's status as a public utility creates the risk that unequal bargaining power could turn liability limitations into outright exculpatory clauses. Here, however, neither the Temporary PPS Contract nor the Permanent PPS Contract runs afoul of public policy.[3]

[54] As to the MSC, CP&L contends that the MSC limits any recovery by Novo to the cumulative monthly payments made thereunder. In this regard, the MSC provides that "[i]n no event shall CP&L's liability arising out of or in connection with the performance or non-performance of the Managed Services exceed the total monthly payments made by [Novo]." However, Novo argues that the liability limitations in the MSC are invalid as a matter of law because CP&L is acting as a public utility, and that as a matter of public policy, such an entity may not contract against its negligence in the regular course of its business. CP&L argues that such exculpatory clauses, although not favored, are permissible when the contract is not related to public service. *Gibbs v. Carolina Light & Power Co.*, 26 N.C. 459, 144 S.E.2d 393 (1965). Here, as do the Temporary PPS Contract, the Permanent PPS Contract, the MSC involves the installation of permanent on-site commercial power, which is not directly related to the public service. Accordingly, since the MSC was entered at arms length, does not violate public policy, and there is no ambiguity as to its construction, the liability limitations it contains are enforceable.

[55] Consequently, there exist no genuine issues of material fact on the question of liability by CP&L to Novo for breach of contract or express warranty under the

---

[2] If this court were to hold the liability limitation invalid, then the underlying factors -- such as liability limitations -- considered by the parties and the Commission when the rate was approved would no longer be in place, and yet the price for the service itself would remain the same. This would effect an alteration of the relative positions of the parties as approved by the Commission, and would constitute a collateral attack on the filed rate.

[3] *Gibbs v. Carolina Light & Power Co.*, 265 N.C. 459, 144 S.E.2d 393 (1965) (stating that while the public interest precludes a public utility from contracting against its negligence in the regular course of its business, exculpatory clauses, although not favored, are permissible when the contract is not related to the public service.) Here, the Temporary PPS Contract and Permanent PPS Contract involve the installation of a permanent on-site commercial power generator, which is not directly related to the public service.

Temporary PPS Contract or the Permanent PPS Contract; and CP&L is entitled to summary judgment in its favor as to Count I and Count III of the Complaint.

[56]  Further, there exist no genuine issues of material fact on the question of whether Novo's recovery against CP&L, if any, for failed performance under the MSC should be limited to a maximum of the total monthly payments made by Novo to CP&L under the MSC; and CP&L is entitled to partial summary judgment in its favor to that effect as to Count II and Count IV of the Complaint.[4]

## VIII.

## CONCLUSION AS TO GPEC

[57]  In their Limitation of Liability sections, both the Temporary PPS Contract and Permanent PPS Contract provide that "neither [CP&L] nor its employees, *its subcontractors*, or suppliers shall be liable for any direct, indirect, general, special, incidental, exemplary, or consequential loss or damage" arising from the contracts (emphasis added).  Further, each of the agreements contains a Use of Subcontractors section that provides "[n]otwithstanding the use of subcontractors, [CP&L] shall continue to be responsible for the quality of the services."  Similarly, the MSC contains a Subcontracting and Assignment provision that provides "[i]t is understood that, while the obligations of CP&L under this Contract may be primarily performed by subcontractors, CP&L remains responsible for the activities of its assignees and subcontractors to the extent such activities are directly related to the performance of CP&L's obligations under this Contract."

[58]  There is no dispute that GPEC's actions and undertakings were within the scope of CP&L's obligations to Novo under the Temporary PPS Contract, Permanent PPS Contract, and MSC.  Further, in each such contract, it unambiguously appears that CP&L would be the responsible party should claims on behalf of Novo arise out of the work to be performed under the contracts.  Accordingly, Novo contracted to pursue its

---

[4] It is clear that Count II is stated in contract, and County IV is stated in negligence.  Here, neither party has posited an argument with regard to whether there is potential inconsistency in the two claims under the rubric of *Ports Authority v. Roofing Co.*, 294 N.C. 73, 240 S.E.2d 3455 (1978); and in light of the rulings in this Order, the court does not deem it necessary to address the issue.

remedies against CP&L for work done in the scope of the contracts, even if such work was performed by a subcontractor of CP&L.[5]

[59]    Therefore, there exist no genuine issues of material fact on the question of whether Novo is barred by the Temporary PPS Contract, Permanent PPS Contract, and MSC from seeking relief from GPEC for its undertakings in the scope of such contracts; and GPEC is entitled to summary judgment in its favor as to Count V of the Complaint.

NOW THEREFORE, based upon the foregoing CONCLUSIONS, it is ORDERED that:

[60]    The motion by Defendant Carolina Power & Light Company for summary judgment in its favor as to Count I and Count III of the Complaint in this civil action is GRANTED, and Count I and Count III of the Complaint hereby are DISMISSED.

[61]    The motion by Defendant Carolina Power & Light Company for partial summary judgment in its favor as to Count II and Count IV of the Complaint in this civil action is GRANTED, and any recovery in this civil action by Plaintiff Novo Nordisk Pharmaceutical Industries, Inc. against Defendant Carolina Power & Light Company for failed performance under the MSC shall be limited to a maximum of the total monthly payments made to Carolina Power & Light Company under the MSC.

[62]    The motion by Defendant Gregory Poole Equipment Company for summary judgment in its favor as to Count V of the Complaint in this civil action is GRANTED, and Count V of the Complaint hereby is DISMISSED.  In view of the fact that the only allegations of the Complaint in this civil action related to Defendant Gregory Poole Equipment Company arise from Count V, as to said Defendant this civil action is DISMISSED.

[63]    The motions for summary judgment by Plaintiff Novo Nordisk Pharmaceutical Industries, Incorporated are DENIED.

FURTHER ORDERED, that the parties shall appear before the court at 11:00 a.m. on Wednesday, October 15, 2008, at the North Carolina Business Court, 227 Fayetteville Street, Raleigh, North Carolina, at which time the court will consider and

---

[5] To conclude otherwise as to GEPC, at least with regard to work done by GPEC under the Temporary PPS Contract and the Permanent PPS Contract, would constitute a collateral attack on the Commission-approved terms of each.

determine case management issues, including the setting of a mediation and discovery schedule for the balance of this litigation.

This the 15th day of September, 2008.